738 N.W.2d 87 (2007)
2007 WI App 185
SOUTHEAST WISCONSIN PROFESSIONAL BASEBALL PARK DISTRICT, Plaintiff-Respondent,
v.
MITSUBISHI HEAVY INDUSTRIES AMERICA, INC., HCH Miller Park Joint Venture, Hunt Construction Group f/k/a Huber, Hunt & Nichols, Inc., The Clark Construction Group, Inc. and Hunzinger Construction Company, Defendants-Respondents,
Ove Arup & Partners California Limited and Federal Insurance Company, Intervenors-Defendants,
Travelers Property Casualty Company of America f/k/a The Travelers Indemnity Company of Illinois, Intervenor-Defendant-Appellant,
Federal Insurance Company, Intervenor-Plaintiff-Respondent.
No. 2005AP2017.
Court of Appeals of Wisconsin.
Oral Argument April 3, 2007.
Opinion Filed July 3, 2007.
On behalf of the intervenor-defendant-appellant Travelers Property Casualty Company of America f/k/a The Travelers Indemnity Company of Illinois, the cause was submitted on the briefs of Brady C. Williamson, Katherine Stadler and Jennifer L. Peterson of LaFollette Godfrey & Kahn, of Madison and Robert C. Johnson (pro hac vice) and William T. Barker of Sonnenschein Nath & Rosenthal LLP of Chicago, Illinois. There was oral argument by Brady C. Williamson.
On behalf of the plaintiff-respondent Southeast Wisconsin Professional Baseball Park District, the cause was submitted on the brief of Susan G. Schellinger of Davis & Kuelthau, S.C. of Milwaukee and John H. Hinderaker of Faegre & Benson LLP of Minneapolis, Minnesota. There was oral argument by John H. Hinderaker.
On behalf of the defendants-respondents HCH Miller Park Joint Venture, Hunt Construction Group, f/k/a Huber, Hunt & Nichols, Inc., The Clark Construction Group, Inc. and Hunzinger Construction Company, the cause was submitted on the brief of Craig W. Nelson of Nelson Connell Conrad Tallmadge & Slein, S.C. of Brookfield, David T. Dekker and Gregg N. Dulik of Thelen Reid & Priest LLP of Washington, D.C. and José M. Pienknagura of The Hunt Corporation of Scottsdale, Arizona. There was oral argument by David T. Dekker.
On behalf of the intervenor-plaintiff-respondent Federal Insurance Company, the cause was submitted on the brief of John A. Busch, Christopher C. Mohrman and Timothy M. Hansen of Michael Best & Friedrich LLP of Milwaukee and Edward B. Ruff III and Michael Clarke (pro hac vice) of Pretzel & Stouffer, Chartered of Chicago, Illinois. There was oral argument by John A. Busch.
On behalf of the defendant-respondent Mitsubishi Heavy Industries America, Inc., the cause was submitted on the briefs of Dean P. Laing and William A. Wiseman of O'Neil, Cannon, Hollman, DeJong S.C. of Milwaukee. There was oral argument by Dean P. Laing.
Before WEDEMEYER, P.J., FINE and KESSLER, JJ.
¶ 1 KESSLER, J.
Travelers Property Casualty Company of America appeals from a judgment finding that it breached its duty to defend Mitsubishi Heavy Industries America, Inc., HCH Miller Park Joint Venture and the Southeast Wisconsin Professional Baseball Park District, as well as the amount of attorney fees and costs for which it was ordered to reimburse Federal Insurance Company, which had paid Mitsubishi's, HCH's and the District's defense fees costs.
¶ 2 The trial court found, and Travelers conceded for the first time at oral argument, that under the terms of its Commercial *92 General Liability policy and endorsements, Travelers had a duty to defend Mitsubishi and HCH against the First Amended Complaint of the District ("Amended Complaint"), which alleged that Mitsubishi and HCH were each negligent and that such conduct caused damage to the completed work on the Miller Park Baseball Stadium. The trial court also found, but Travelers disputes, that Mitsubishi's and HCH's counterclaims against the District were so inextricably intertwined factually with the allegations by the District against Mitsubishi and HCH that Travelers also had a duty to defend the District against those counterclaims. The trial court ruled on three separate occasions that Travelers had the duty to defend. Travelers consistently refused to undertake the duty. Finally, the trial court granted a declaratory judgment that Travelers had breached its duty to defend all three insureds and, because of the breach, was liable for all damages that flowed from the breach and all defense costs incurred by each party, including those costs and fees paid by Federal, from the date of the Amended Complaint.
¶ 3 The trial court rejected Travelers' claim that its obligation should be reduced by the defense costs paid after the date of the Amended Complaint by Federal, an excess carrier, and also rejected Travelers' claim that it was entitled to an additional evidentiary hearing, beyond the hearing already provided by the trial court, on the reasonableness and necessity of the legal fees and costs paid by Federal or incurred by the District, HCH or Mitsubishi. The trial court entered judgment against Travelers. Travelers appealed. We affirm.

BACKGROUND
¶ 4 Four companies issued five insurance policies covering the Miller Park Baseball Stadium construction. The policies were layered in an Owner Controlled Insurance Program. Because of "layering," if one policy paid its limits then the next policy in line (the next "layer") became responsible. Travelers' policy specifically states that it is the primary policy. The remaining insurers are sequenced layers of excess coverage.[2]
¶ 5 This layering arrangement continued from the beginning of the stadium construction, in policy year 1996/1997, through completion of construction and the stadium opening on March 30, 2001. Each year, the Travelers' policy was reinstated and the limits of coverage were refreshed.[3] Hence, if an occurrence exhausted the limits of Travelers' policy in one policy year, new limits in the same amount would become available in the following policy year for new occurrences. Likewise, if Travelers' liability policy limits were exhausted in one policy year, each excess carrier in sequence would be responsible according to the terms of their policies.
¶ 6 Only Travelers' primary policy and Federal's excess policy are involved in the dispute in this case. Travelers' policy included an extension which covered "property damage" caused by "an occurrence" during the three-year period commencing upon completion of the stadium.
*93 ¶ 7 On July 14, 1999, a crane collapsed at the Miller Park construction site, killing three ironworkers. The tort claims that followed resulted in a ninety-four million dollar verdict for the families and estates of the men who died. Before the verdict in the crane collapse case, Travelers paid its two million dollar liability policy limit per occurrence from its 1999/2000 policy, and declined to provide further defense of crane collapse claims, based upon a provision in its policy which allowed it to avoid further defense responsibility when it exhausted its liability limit in settlement.
¶ 8 In January 2002, the District sued Mitsubishi and HCH for damages to property caused by the crane collapse. Mitsubishi and HCH each responded with: (1) affirmative defenses; (2) counterclaims against the District asserting entitlement to extra payments for goods and services not included in the original contract; and (3) cross-claims against each other disputing responsibility for delays and errors. Travelers refused to defend, arguing both that it had exhausted its policy limits on the crane collapse and that there was no coverage under the policy. Federal, as an excess carrier, and under a reservation of rights letter, undertook the defense.[4] On March 3, 2003, the trial court held that Travelers' payment of its policy limits in the crane collapse injury case also terminated its duty to defend against crane collapse property damage claims. Travelers' duty to defend Mitsubishi and HCH against crane collapse claims ended because Travelers' policy provided that: "Our . . . duty to defend end[s] when we have used up the applicable limit of insurance in the payment of judgments or settlements. . . ." The trial court, when it ruled that Travelers had no duty to defend the crane collapse claims, prophetically observed:
But based upon the four corners [of the complaint], I would agree that Travelers at the juncture that we have here today did not have a duty to defend and that it exhausted its policy coverage as to [the crane collapse] related claims. . . .
. . . .
Now, that being said, I suspect there's going to be an amendment. [Travelers] may very well be back in here under issues of the non-[crane collapse] issues.
(Emphasis added.)
¶ 9 Because of the layering effect of the excess policies, Federal became responsible for defending the crane collapse property damage litigation. Travelers characterizes Federal as thus becoming the "primary insurer"[5] because Federal became responsible for the duty to defend. In the context of insurance terms and the policy layering here, that is not correct. See Treder v. LST, Ltd. P'ship, 2004 WI *94 App 75, ¶¶ 14-15, 271 Wis.2d 771, 679 N.W.2d 555 (discussing relationship between true excess, umbrella and primary policies), review denied, 2004 WI 114, 273 Wis.2d 656, 684 N.W.2d 137; Oelhafen v. Tower Ins. Co., 171 Wis.2d 532, 537-38, 492 N.W.2d 321 (Ct.App.1992) (comparing character of an umbrella policy to a primary policy). Under its policy, Federal was, and remained, an excess carrier. Under its policy, Travelers was, and remained, the primary carrier. However, because Travelers had exhausted its limits for crane collapse claims under its policy,[6] Travelers was no longer responsible for the defense of the crane collapse claims. That did not make Federal the "primary" insurer[7] in the context of the layering scheme in the Owner Controlled Insurance Program; it only triggered Federal's duty as an excess carrier to defend the crane collapse claims.
¶ 10 Beginning April 1, 2001, as the stadium opened, the District purchased three years of additional coverage from Travelers as an extension endorsement on the then-existing policy.[8] The endorsement, called the Products and Completed Operations Extention [sic], covered an "occurrence" causing damage to "your work" during the three-year period of extended coverage. "Occurrence" is defined in the policy to include "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property," while "[y]our work" meant "[w]ork or operations performed by you or on your behalf; and [m]aterials, parts or equipment furnished in connection with such work or operations."
¶ 11 On June 6, 2003, the District served its Amended Complaint, which claimed that negligence by Mitsubishi and HCH caused a variety of damage to several different aspects of the completed stadium. Mitsubishi denied the allegations in the Amended Complaint. Mitsubishi incorporated by reference its prior counterclaims against the District and cross-claims against HCH which were filed in response to the first Complaint. HCH responded to the Amended Complaint alleging, among other things, negligence by the District. The original cross-complaints, claiming the other parties had performed improperly, remained. Travelers moved for "Declaratory/Summary Judgment" that it had no duty to defend any party "arising out of the First Amended Complaint."
¶ 12 The trial court measured the Amended Complaint allegations against the language of the policy and concluded that the new allegations arguably alleged one or more "occurrences" that caused "property damage," at least during the time covered by the Products and Completed Operations Extention [sic]. Finding that a tort claim against a subcontractor *95 was alleged and arguably covered by the extended policy, the trial court held that Travelers now had a duty to defend Mitsubishi and HCH against the District claims beginning June 6, 2003, when the Amended Complaint was served. The trial court also concluded that, on the face of the pleadings, the HCH and Mitsubishi counterclaims were factually so intertwined with the District's negligence claims that a duty was also triggered to defend the District against these counterclaims. The court specifically excluded any crane collapse claim from Travelers' duty to defend.
¶ 13 The trial court, on three occasions over nearly thirteen months,[9] ruled repeatedly that Travelers had a duty to defend Mitsubishi, HCH, and the District based upon the allegations in the Amended Complaint, the responses thereto and the provisions of Travelers' policy. Each time, Travelers refused to undertake the defense.
¶ 14 At a hearing on March 25, 2004, Travelers' motion for "Declaratory/Summary Judgment" was decided. The trial court observed that: Judge Moroney had dealt only with the crane collapse occurrence and that the policy limits are refreshed and reinstated each policy year, through March 30, 2001, when the stadium opened. Thereafter, there was a three-year policy extension under the Products and Completed Operations Extention [sic]. The Amended Complaint allegations, especially paragraph 31, were not before Judge Moroney. The court specifically discussed these new allegations and how they related to Travelers' policy:
[P]aragraph 31, subparagraph "a." The property damage . . . is accelerated wear and premature failing of the bearings, . . . potential damage to the roof structure. In "b" . . . past-tense verbs [describing] property damage . . . the bearings were contaminated with [metal][10] particles and water. Paragraph "c" . . . the toblerone spindle roller bearings cracked during the first year of operation. Paragraph "d", the track beam rail cracked, and in other areas the pad under the track failed. Paragraph "f", the truss end wall panels on the . . . outfield side of the roof constructed by Mitsubishi had construction defects that resulted in intrusion of water through the panels. Paragraph "g", the roof leaked, the membrane leaked; "h", water penetrated through the roof membrane, caused the deck to rust; "i", the high bowl dampers malfunctioned; "j", the roof bolts experienced failures, gaps, and elongations.
. . . .
[T]here are particular allegations of the tort claims of the negligence, the poor cite [sic] supervision and management, the design negligence, the maintenance negligence and breach of contract. Both tort and breach of contract are clearly alleged and tied to the specific property damage allegations I've just gone through.
(Footnote added.)
¶ 15 The trial court then examined whether there was at least one claim in the Amended Complaint not precluded by a policy exclusion. The court considered all relevant policy exclusions and found:
2.j(5) excludes coverage for damage where you are . . . performing work. . . . I believe that since the work is completed, that the "are performing" portion of 2.j.(5) is inapplicable. . . . 2.j(6), the portion of the work that is completed . . . is *96 excepted under the completed operations part of this claim, and at least the collateral water damage survives the exclusion and triggers the duty to defend. . . . [I]t isn't just the collateral water damage, it would also be the cracked bearings and rail as well. . . . [A]ccordingly, 2.j's exclusions are not a bar to your duty to defend . . . all three of the insureds in this case.
. . . .
Real estate in this case is the Miller Park stadium and the property that it's on within the definition provided there; and, accordingly, there's no exclusion there in 2.k for your duty to defend.
As to 2.l . . . the amended complaint is replete with allegations about subcontractors. . . . [P]aragraph 26 as well as several other paragraphs . . . refer to . . . the negligence of Mitsubishi, and . . . refers to the work being done by the subcontractors . . . accordingly, the 2.l exclusion would not apply to the work being done by the subcontractors. . . .
As to 2.m, the impaired property argument . . . the entire project is . . . Mitsubishi's work, including the work of their subcontractors, this exclusion doesn't apply.
. . . .
[T]he business risks exclusions  in 2.j, 2.k, 2.l, and 2.m don't operate in this regard to free you from your duty to defend.
This is so clearly a project and a contract for the construction of a stadium with a roof. It was not in any way a  professional service contract. Even though professional services are involved in the building of the stadium and the roof, the end product of the contract is not the professional services. It's the completed product.
And, finally, with regard to the 2.b contractual liability exclusion . . . in paragraph 47 of the complaint . . . the District [alleges] . . . HCH's liability . . . for the negligence of Mitsubishi and the supervision of their subcontractors, and in their performance of their contract obligations generally . . . and that is the exception to the contractual liability exclusion.
¶ 16 The trial court also discussed HCH's and Mitsubishi's responses to the Amended Complaint, which incorporate their earlier responses to the original Complaint.
[Travelers'] duty to defend all three flows from the amended complaint of the District to the extent of the District's claims against Mitsubishi and also to the extent of HCH's contractual insured contract with regard to Mitsubishi. I also find . . . that the reiterated counterclaims of Mitsubishi and HCH draw in the amended complaint allegations of the District, and that the cross-complaint of HCH to Mitsubishi certainly reiterates and draws in the alleged negligence of Mitsubishi for which HCH is contractually responsible.
While speaking of Travelers' policy obligations, the trial court concluded that under applicable Wisconsin law, "where there's even one claim for HCH that triggers your duty to defend, and I find that there is here, then you have a duty to defend them. So they, like Mitsubishi and the District, are entitled to your defense in this case."
¶ 17 Travelers undertook no defense. Instead, Travelers asked the court to clarify its March 25 ruling by asking the court to hold that the resulting April 27, 2004 written order finding a duty to defend "was based upon potential coverage under . . . the Products-Completed Operations Hazard Extension." After extensive briefing by all parties, the trial court held a *97 hearing on September 1, 2004, at which it gave Travelers an opportunity to reply to the written arguments of the others, although the court had not permitted any party to file reply briefs. Travelers' position was that "the only policy that can trigger coverage is the completed [operations] tail . . . [that] begins March 30, 2001." Mitsubishi's counsel suggested to the court that the whole purpose of the "clarification" request was "an attempt on Travelers['] part to find out how much money they can tender and walk, and that's why they want you to limit their exposure to the last policy."
¶ 18 The trial court declined to give an advisory ruling, or to change the March 25 decision. The trial court described Travelers' March motion as, in fact, a duty-to-defend motion.[11] The court also observed that:
[T]he law is well settled that that duty is triggered when at least one policy is triggered. . . . And in this case my findings and my order in March of '04 was that the '00/'01 primary policy with the three-year tail, the completed [operations] tail, was triggered, that there were allegations that were fairly debatable that provided for coverage under that policy, and, accordingly, Travelers had the duty to defend. And I spelled out defend who and in what claims.
. . . .
So I find that what Travelers has done today is really brought a motion for reconsideration.
[Travelers] had a duty-to-defend motion. I gave you a decision. You got a written order from that decision. And four months later you filed something called a request for clarification that this court finds to be really a motion for reconsideration under [WIS. STAT. §] 806.07(1). And you have the burden on such a motion to show that there was mistake, inadvertence, or excusable neglect, or that there was newly discovered evidence or fraud, misrepresentation, or misconduct of an adverse party or some other reason justifying relief from the March '04 decision.
You have not met that burden. . . .
¶ 19 Still, Travelers did not undertake the defense. Instead, Travelers moved for "Declaratory Judgment/Determination of Applicable Insurance Policies," essentially again asking the trial court to tell it which specific policy year applied to its duty to defend. Federal, HCH and the District responded with motions for declaratory judgment against Travelers seeking a judgment that Travelers had breached its duty to defend, and should be ordered to pay damages, litigation costs and attorney fees. Mitsubishi joined the District's motion.
¶ 20 After more briefing and further arguments, on October 25, 2004, the trial court granted declaratory judgment in favor of the District, HCH, Mitsubishi and Federal, concluding that the duty to defend issue "doesn't get any riper" as it had already been decided on more than one occasion. The trial court made the following findings regarding Travelers' breach of the duty to defend:
Travelers did breach its duty to defend . . . between July of '03 and my previous ruling March 24[sic] of '04. . . . Travelers chose not to defend under a reservation *98 of rights, which they could have done after the District amended their complaint.
Travelers breached its duty to defend even after my ruling of March 24, [sic] '04.
The District is entitled to all damages naturally flowing from Travelers' breach. This includes the right to contest coverage or assert policy limits and ability to control the defense.
. . . .
Travelers concedes that there was a formal tender from HCH . . . before Travelers filed their motion to bifurcate and stay on August 29 of '03. . . . Travelers breached its duty to defend and must reimburse attorneys' fees, costs, settlement, judgment and loses control of the defense vis-à-vis HCH.
¶ 21 The trial court also again resolved Travelers' continued argument that it had no duty to defend because it was not the "primary" insurer.
Travelers is the primary policy. The policy says it's the primary policy. It says right at the beginning of the policy, This insurance is primary. . . . There's nothing in Federal's policy that says it is primary. The only basis for Travelers to bring this motion at all is Judge Moroney's language that for one brief instance Federal stepped into the shoes of Travelers, the primary carrier, and became primary, but that does not make Federal the primary carrier.
Specifically, the trial court noted:
Travelers is the primary carrier on all but that $2 million occurrence part of this case from the '99-2000 Big Blue [crane] collapse. . . . The primary carrier has the primary defense obligation vis-à-vis [the] excess carrier.
. . . .
The question is whether the excess carrier has a right to reimbursement.
. . . .
[W]e have only one primary carrier, and it's Travelers, and they've got the duty to defend, so it therefore naturally flows that Federal is owed their reimbursement with the exception [of the crane collapse occurrence].
¶ 22 The trial court order stated that, except for the crane collapse occurrence, Travelers had a duty to defend the District, HCH and Mitsubishi, Travelers had breached that duty as to each, and consequently Travelers was "precluded from contesting coverage or limits in this case" and must "indemnify the District, HCH and [Mitsubishi] for all claims . . . any judgment[s] . . . [or] settlement, without regard to Traveler's policy limits." The court directed Travelers to reimburse the District, HCH and [Mitsubishi] "for all litigation costs and attorneys fees incurred by them in this matter since the filing of the Amended Complaint on June 6, 2003 . . . through final resolution of this action," and
to reimburse Federal for all sums it has reimbursed to or expended on behalf of the District, HCH and/or [Mitsubishi] for their litigation costs and attorney fees incurred in this matter since the filing of the Amended Complaint on June 6, 2003, and for all sums that Federal pays for their costs and fees . . . through final resolution of this action.
¶ 23 Because an award of reasonable attorney fees and costs for breach of the duty to defend is to be determined by the court, a hearing for that purpose was set for February 22, 2005. Between the October 25 hearing and the scheduled February 22 hearing, the trial court resolved numerous discovery disputes. These concerned, essentially, what depositions Travelers could take and what documents it *99 could obtain regarding litigation costs and attorney fees paid or incurred. Because the duty to defend does not include a duty to prosecute affirmative claims for relief, see Towne Realty, Inc. v. Zurich Insurance Co., 201 Wis.2d 260, 264, 548 N.W.2d 64 (1996), a major focus of dispute were the agreements entered into between Federal and each of the insureds that established certain percentages of the total fees and costs Federal would pay to each insured, instead of attempting to specifically separate each item of attorney work or litigation cost between offensive claims and defensive actions.
¶ 24 On February 16, 2005, the trial court held a hearing on the pending discovery disputes. While the trial court had found at the October 25, 2004 hearing that "[t]he District's agreement with Federal is irrelevant to Travelers' duty to defend," the trial court acknowledged at the February 16, 2005 hearing that the agreements were relevant to allocation of fees and costs between offensive claims and defensive action. During the hearing, it became apparent that in November 2004, Federal had produced to Travelers all of the bills, invoices and similar documents Federal had received from the District, Mitsubishi and HCH. The trial court limited the scope of discovery as to fees and costs consistent with its earlier ruling that Travelers' refusal to perform its duty to defend forfeited its right to control the defense and that Travelers would not be allowed to second-guess strategic or logistic decisions already made.[12] The trial court explained what Travelers, as the party breaching its duty to defend, was entitled to review:
Travelers is entitled to . . . whatever copies of checks . . . that Federal wrote  because, obviously, they're entitled to know what it was that Federal did pay.
[T]hey're entitled to all the bills. . . . [I]t's a legitimate question for Travelers to ask . . . did Federal pay the actual bills of the party?
[T]he harder question is to what extent Travelers gets to attack the reasonableness and the necessity of the billings from the parties to Federal. I take a very narrow view of that. I think it's too late for Travelers to go back and say, ["]This strategy choice was unnecessary, unwarranted. . . . [T]his expert expense was foolish.["] That is no longer fair game. However, reasonableness and necessity within this parameter I think is still fair game, and that would be something really glaring like was there double billing. Travelers is entitled to get discovery on whether . . . what Federal paid exceeded defense costs, and whether there were glaring billing entries such as double booking. And that's the discovery. And so I think it's checks, all the bills, the fee agreements.
¶ 25 It is apparent from the record that Travelers wanted to depose various executives of Federal to inquire into the specific process of review of each bill, to demand an explanation of how Federal determined whether each item was related to the defense of covered claims rather than uncovered claims, to ask why Federal would *100 agree to pay for an uncovered item, and to explain how the percentage agreements with the District, HCH and Mitsubishi were agreed upon and why Federal later agreed to pay a higher percentage. The trial court permitted the deposition of one of Federal's attorneys who was responsible for reviewing all invoices for reasonableness and for ensuring that Federal received all invoices and billing statements related to this case for payment, but denied a request to question the insurance company's employees and the clerical staff who administered the process of payment.
¶ 26 The trial court concluded that the February 22 hearing was no longer practical and amended the scheduling to allow the parties until March 16 to complete the discovery. Any further discovery motions were to be filed by March 18, and Travelers was given until March 31 to file any additional briefs on Federal's pending motion to enforce the October 25 order. The other parties were given until April 8 to respond, with April 15 set as the new date for the court's decision on fees and costs.
¶ 27 The trial court specifically reminded the parties that, unless the court heard from Travelers before March 18, what would be determined at the April 15 decision date were "issues of law, and under Wisconsin law the Court is to determine the reasonableness and necessity of the fees, and in this case . . . how much Federal paid, and whether it was related to the defense of the parties." In response to an inquiry from Travelers, the court indicated that it would entertain a request to present expert testimony if Travelers requested it after review of the bills. The record discloses no such request.
¶ 28 After the close of discovery, and after the due date for its brief, Travelers submitted two affidavits by Attorney Scott Hansen who Travelers had retained as an expert witness. His first affidavit, dated April 6, 2005, does not challenge the reasonableness or necessity of any of the expenses reviewed. Hansen reports that he was asked "to consider whether the costs of prosecuting offensive claims could be segregated from the cost of defense and, if so, to what extent." The affidavit includes a report which describes spending approximately two hundred hours reviewing all of the pleadings, the attorneys' bills and invoices, expense records, expert reports and other documents received. Hansen describes his attempts to allocate the attorneys' bills between offense and defense claims, and acknowledges that he could not do so. Instead, he reports that he divided the total expert witness costs between what were, in his opinion, offense and defense claims which the particular expert addressed. He then calculated the portion of the expert fees relating to offensive claims as a percentage of the total expert expenses, and reasoning that attorney time was divided as expert time was divided, applied that percentage to the total attorney fees and litigation costs incurred by the insured that retained the expert. Hansen concluded that "some portion" of HCH's total budget was for offensive claims alone, but did not identify that portion. He concluded that sixty-nine percent of Mitsubishi's expenses were offensive, and that forty-seven percent of the District's expenses were offensive. Hansen comments in the first affidavit that the total fees and expenses are large and were incurred in approximately thirty months.
¶ 29 On April 12, 2005, Hansen signed a second affidavit. Again, Hansen did not identify any specific expense or fee that he considered unreasonable. Hansen reported that on April 6, 2005, Travelers first asked him to evaluate the reasonableness of fees and costs and that he could not do so before the April 15, 2005 hearing. He described for the court what he wanted to *101 do before he expressed an opinion on the reasonableness of the fees and costs. The proposed analysis included: (1) obtaining an audit of all bills by an outside firm to break the reported time and activity down into "task units"; (2) thereafter comparing the time spent in each identified task unit to the work product produced to evaluate whether the time spent was reasonable for the product produced; and (3) then considering the various ethical criteria for reasonable fees described in SCR 20:1.5(a), apparently applied to each "task unit." Hansen does not say how many additional days he needed to perform the proposed analysis, but comments negatively on the law firms not producing "task" billing instead of time and work descriptions and on what he sees as Federal's lack of billing controls and failure to require a litigation budget. The trial court received this document no more than three days before the scheduled fee hearing.
¶ 30 At the hearing on April 15, the trial court described the specific materials it had reviewed in preparation for the hearing. These included "three modest-sized banker boxes plus one double-decker banker box, all of which contain bills." The court made it clear that her familiarity with the details of the various claims by each party, gained over months of motions and analysis,[13] made her understanding of the interrelationship of the claims far superior to what Hansen might have learned.[14] The court explained its process of review in detail:
I am very, very, very familiar with the claims and defenses and their interrelationship. I have had to analyze this. I've had to give many rulings on this case. And every time I've had to give a ruling and in particular the rulings I gave in October of '04, I have spent umpteen hours analyzing the claims of each particular party, the defenses of the opposing parties to that particular claim. They don't always overlap.
I'm finding, first . . . that there has been an offset for the offensive claims, and that offset has taken place in the ongoing *102 negotiations between the insureds and Federal, apportioning responsibility for payments, and to the extent that it hasn't been, it can't be.
[I]n the case of HCH, this case is a hundred percent defensive. And I would say that in the case of Mitsubishi as well. Yeah, they filed a counterclaim, but, for heaven's sakes, it was a defensive strategy. Everybody understood that from day one. It was an excellent defensive strategy.
[I]t is impossible to go further and separate the offense from the defense expenditures in this matter. They are so incredibly inexorably intertwined. It's just too darn complicated. And it isn't that anybody's lazy. Apparently, all of you are willing to hire all of these folks to do all this stuff. . . . It would be repeated independent judgment calls about whether that was defense, whether that was offense. . . . Any time a lawyer prepares for a deposition, what's offense, what's defense? . . . [T]hat is a subjective thing that it would be imprudent and unreasonable to go through, that analysis, to come up with a further offense-versus-defense offset, further than the seven some million that has already been done here.
¶ 31 The trial court then discussed the agreements Federal made to pay only a percentage of the insureds' actual attorney fees and costs, as a method of efficiently allocating between offensive and defensive costs.[15] The court explained why the agreements were reasonable responses to Travelers' breach of its duty to defend:
Travelers keeps arguing that there wasn't an offset for the purely offensive part of this case, and I don't find that to be true at all. There was . . . [eight] million that Federal negotiated out that they never paid for, that nobody's asking Travelers to pay for, out of . . . $34,566,833 that Travelers admits . . . was expended in attorneys' fees for the three insureds to date. . . . Federal only paid, or is paying $27,360,266. . . . [T]hat leaves $7,206,566.80 that was not charged to Federal or Travelers and is, in my judgment, based on my extensive familiarity with this case, a fair and reasonable apportionment of the offense portion of this case.
[A]s to whether the method used by Federal in coming up with the percentages and the two-stage negotiation was fair and reasonable, I find that it was. . . . This all happened because of Travelers' breach. Federal was left carrying the ball, and the parties were left carrying the ball because their insurer didn't step up to the plate and didn't do any of the other procedures that our Wisconsin Supreme Court has said to do. . . . And I don't think they have to be held to the first percentages that were come up with. This was a case in flux. . . . [A]t each point of the Court's rulings, and in preparation for the trial, it was a living, breathing thing, and Federal and the insureds had to do whatever they could do to keep the case afloat. If that isn't, in the language of Newhouse, costs that the insured showed me naturally flowed from the breach, I don't know what is.

*103 [I]t was entirely reasonable for the parties to come up with the numbers that they came up with, and I find that those numbers and that active apportionment naturally flowed from Travelers' breach. The points at which these apportionment agreements came up were points at which Travelers had already been found by this Court to have breached their duty to defend. They could have jumped in at any point. They chose not to.
[T]he rest of the apportioning out of offense versus defense has been inexorably intertwined, can't be done further, and Travelers is stuck with it because that's what naturally flowed from their breach of their duty to defend.
¶ 32 The trial court did an analysis of the reasonableness of the attorney fees and costs. The court commented that it did
not believe that part of this Court's reasonableness inquiry . . . should be, to permit Travelers to challenge whether an outside copy service was needed or not, or whether a courier service was needed or not. . . . Travelers, under the circumstances and facts of this case, long ago forfeited the right to nitpick as to whether [an attorney] should have walked to the Courthouse and delivered the documents or paid a courier. . . . That isn't what is meant by the Fireman's Fund [Ins. Co. of Wis. v. Bradley Corp., 2003 WI 33, 261 Wis.2d 4, 660 N.W.2d 666,] edict in the context of this case."
The court correctly noted that Federal, as the party seeking payment, has the initial burden of producing documentation of the bills and evidence of their reasonableness.
¶ 33 The trial court noted its eleven years of experience reviewing fees and costs as a judge and its understanding from private practice of how to generate bills and billing systems. As we previously noted, the court described its great familiarity with the details of the work done in this case by all of the attorneys involved. The court then explained the process it used to analyze attorney bills. First, it sampled the District's bills and identified on the record the specific bills it reviewed for three different attorneys, each of whom the court had seen perform work in this case. The court then computed the hourly rate for each attorney, based upon the work identified on the bill, and concluded after that review that the "times and charges were fair and reasonable." The court also reviewed "every single one" of the costs and disbursements on a separate bill and "found them all to be reasonable." The court used the same process for Mitsubishi's attorney fees and disbursements, all of which it found to be "fair and reasonable based on [its] judgment and [its] experience in the rates and attorneys' efforts in this county." The same process was applied to the HCH bills for attorney fees and costs, with similar conclusions that all were "fair and reasonable attorneys' fees and charges." The court advised the parties that it looked at various other pages of bills, and on each page found "the charges of lawyers and the staffers reasonable and fair. The times looked appropriate, and so did the disbursements and costs." The court observed that the bills were "amply detailed," concluded that Federal met its initial burden to establish the reasonableness and necessity of the fees requested, and that the burden thus "shifts to Travelers to point out problems."
¶ 34 On April 15, Travelers alleged that it had been given only five days to develop its arguments about reasonableness of the fees and costs and therefore moved for an "extension of time to allow us to do a more thorough review." The trial court refused *104 to adjourn the hearing. The court noted that not only the transcripts from February to April, but indeed Travelers' own brief opposing the amount of fees requested, showed that the trial court had repeatedly stated that reasonableness of the fees and costs was to be the subject of the ruling scheduled for April 15, 2005. When the court, in October 2004, found that Travelers breached its duty to defend, the court set the next hearing to determine the amount of fees and costs to be awarded. Travelers knew then, or certainly should have known, that the law includes reasonableness as part of a determination of an attorney fees award. See Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); Fireman's Fund Ins., 261 Wis.2d 4, ¶ 67, 660 N.W.2d 666. Further, the trial court again explained in February 2005, that it would not permit Travelers to "second-guess strategy decisions made by the insureds or Federal because . . . [Travelers] had forfeited that [right to control the defense] when they breached [the duty to defend]." On February 16, the trial court ordered discovery for Travelers so it could do a reasonableness review and had adjourned the hearing on fees to give Travelers additional time to conduct its review.[16]
¶ 35 The court concluded that Travelers had "ample time and opportunity to review all of these bills for reasonableness" and noted numerous specific objections Travelers made to specific items. The court ruled on each of Travelers' objections. The court rejected Travelers' claim that it should not pay for fees and costs incurred between the date the Amended Complaint was served and the date each insured formally tendered defense, repeating an earlier ruling that the duty to defend began on June 3, 2003, when the Amended Complaint was served because that was when Travelers had notice of the relevant allegations. The court reduced the amount due to Federal by $15.37 and $2.33 for specific billing errors raised by Travelers. The court also reduced the amount due by $230,876.96, the amount the District paid for a non-lawyer case manager it retained. However, charges by HCH for litigation services by in-house counsel, pursuant to a specific agreement with Federal, were approved. The court specifically rejected reduction for numerous other items Travelers challenged,[17] finding that these items naturally flowed from providing a reasonable defense which, in this case, involved witnesses on two continents, information in Japanese, and three million pages of documents. Travelers' claim that the case was over-tried and over-pled was emphatically rejected. The court stated: "This is one of the best-tried, best-pled, best-argued cases I've ever had the good fortune to see." The court specifically discussed the unusual size and extraordinary complexity of this case:
[T]his county has never seen a case this big. We've never had one that involved the kind of issues that this one does involve. . . .

*105 The measure of the complexity of this case is the number of claims, the initial amounts claimed by each side, in excess of 140 million [dollars]. . . . [T]his is a case that covered a couple [of] continents. This is a case that had millions of documents, and . . . an incredible number of depositions. It was anticipated to be a three-month trial. I . . . gave oral rulings for eight hours one day. . . . The professional skill and the expertise called upon in this case was enormous.
This case presented management problems unsurpassed in any case I've ever seen . . . and the attorneys that handled this case and made the judgments that Travelers is stuck with today were . . . of the highest standing in their profession. I've never ceased to be impressed with the professionalism, the intelligence, the quality of work, and the civility of every lawyer involved in this case. . . . [T]he pecuniary benefit derived by the insureds from the services rendered by their attorneys and by Federal, who funded those attorneys, has been extraordinary. . . . HCH and Mitsubishi walked away not having to pay, and the District paid a nominal two million.
¶ 36 The trial court concluded that the attorney fees incurred totaled $34,566,000, that Federal paid or committed to paying $27,260,266, and that after deducting the items the court found should not be paid, the amount that Travelers owed Federal as of the date of the hearing was $27,129,373, plus statutory interest from the date of each payment with additional amounts still to be paid by Federal to be included. Travelers appealed.[18]

STANDARD OF REVIEW
¶ 37 The appellate court is "in just as good a position as the trial court to make factual inferences based on documentary evidence and . . . need not defer to the trial court's findings." Cohn v. Town of Randall, 2001 WI App 176, ¶ 7, 247 Wis.2d 118, 633 N.W.2d 674. An appellate court "must decide questions of law independently without deference to the decision[] of the trial court." Ball v. District No. 4, Area Bd. of Vocational, Technical and Adult Educ., 117 Wis.2d 529, 537, 345 N.W.2d 389 (1984). But an appellate court values a trial court's decision on a question of law. Holman v. Family Health Plan, 216 Wis.2d 100, 108, 573 N.W.2d 577 (Ct.App.1997), rev'd on other grounds, 227 Wis.2d 478, 596 N.W.2d 358 (1999). Whether discretion was properly exercised is a question of law. Seep v. State Pers. Comm'n, 140 Wis.2d 32, 38, 409 N.W.2d 142 (Ct.App.1987).
¶ 38 "When a [trial] court awards attorney fees, the amount of the award is left to the discretion of the court." Kolupar v. Wilde Pontiac Cadillac, Inc., 2004 WI 112, ¶ 22, 275 Wis.2d 1, 683 N.W.2d 58. We uphold the trial court's determination of attorney fees unless the court erroneously exercised its discretion. Standard *106 Theatres, Inc. v. DOT, 118 Wis.2d 730, 747, 349 N.W.2d 661 (1984). "We give deference to the [trial] court's decision because the [trial] court is familiar with local billing norms and will likely have witnessed firsthand the quality of the service rendered by counsel." Kolupar, 275 Wis.2d 1, ¶ 22, 683 N.W.2d 58. "Thus, we do not substitute our judgment for the judgment of the [trial] court, but instead probe the court's explanation to determine if the court `employ[ed] a logical rationale based on the appropriate legal principles and facts of record.'" Id., ¶ 22, 683 N.W.2d 58 (quoting Hughes v. Chrysler Motors Corp., 197 Wis.2d 973, 987, 542 N.W.2d 148 (1996)) (one set of quotation marks omitted; alteration in original).
¶ 39
A discretionary determination, to be sustained, must demonstrably be made and based upon the facts appearing in the record and in reliance on the appropriate and applicable law. Additionally, and most importantly, a discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination.
Hartung v. Hartung, 102 Wis.2d 58, 66, 306 N.W.2d 16 (1981).
¶ 40 A trial court erroneously exercises its discretion when it: (1) fails to consider and make a record of the relevant factors; (2) considers improper or clearly irrelevant factors; and (3) gives too much weight to any single factor. Sunnyside Feed Co. v. City of Portage, 222 Wis.2d 461, 471, 588 N.W.2d 278 (Ct.App.1998). It may also occur when the trial court makes an error of law. Id. at 471-72, 588 N.W.2d 278.

DISCUSSION
A. Duty to defend
¶ 41 The duty to defend an insured is based on the language in the insurance contract. Radke v. Fireman's Fund Ins. Co., 217 Wis.2d 39, 43, 577 N.W.2d 366 (Ct.App.1998). "If coverage is fairly debatable, the insurer is estopped from arguing coverage defenses." Id. at 47, 577 N.W.2d 366 (citing United States Fire Ins. Co. v. Good Humor Corp., 173 Wis.2d 804, 818-19, 496 N.W.2d 730 (Ct. App.1993)). "The duty to defend is broader than the separate duty to indemnify because the duty to defend is triggered by arguable, as opposed to actual, coverage." Id. at 44, 577 N.W.2d 366; see also Newhouse v. Citizens Sec. Mut. Ins. Co., 176 Wis.2d 824, 834-35, 501 N.W.2d 1 (1993). The scope of the claim is determined from the face of the pleadings, not from evidence extrinsic thereto. Radke, 217 Wis.2d at 43, 577 N.W.2d 366; Newhouse, 176 Wis.2d at 834-35, 501 N.W.2d 1; see also Grube v. Daun, 173 Wis.2d 30, 72, 496 N.W.2d 106 (Ct.App.1992).[19]
*107 ¶ 42 The duty to defend exists if any one claim arguably falls within the policy coverage. Grube, 173 Wis.2d at 72, 496 N.W.2d 106. The coverage need only be arguable or fairly debatable. Radke, 217 Wis.2d at 44, 577 N.W.2d 366; Newhouse, 176 Wis.2d at 835, 501 N.W.2d 1. An insurance company that disputes coverage, and thus the duty to defend, has several choices. Radke, 217 Wis.2d at 45, 577 N.W.2d 366. The company may enter into a nonwaiver agreement with the insured wherein the insurer would agree to defend and the insured would acknowledge the right of the insurer to contest coverage. Id. The company may seek to bifurcate the trial and obtain a declaratory judgment on coverage in advance of the determination of liability. Id. The company may defend the insured under a reservation of rights, that is reserving its right not to pay a judgment if it is determined that coverage does not exist. Id. Or, the company may decline to defend and risk the consequences. Id.
¶ 43 Travelers first sought a declaratory judgment that it had no duty to defend against claims in the Amended Complaint. The District, HCH and Mitsubishi as a subcontractor were all insureds under Travelers' policy. The trial court held that the District's Amended Complaint asserted a claim against HCH and Mitsubishi that was fairly debatable under the policy, thereby triggering Travelers' duty to defend both HCH and Mitsubishi. The trial court also held that the HCH and Mitsubishi counterclaims and cross-claims affirmatively included substantial allegations included in their defenses against the Amended Complaint. Therefore, the court concluded Travelers also had a duty to defend the District against the HCH and Mitsubishi claims. In the context of Travelers' repeated refusal to undertake any defense, the trial court repeated this finding on several subsequent occasions, and ultimately found that Travelers breached its duty to defend as to all three insureds. Still, Travelers did not undertake the defense of any party.
¶ 44 The consequences of breaching the duty to defend are substantial and an insurer who declines to defend does so at its peril. Grieb v. Citizens Cas. Co. of N.Y., 33 Wis.2d 552, 558, 148 N.W.2d 103 (1967). Where an insurer improperly refuses to defend, it will be held to have waived any subsequent right to litigate coverage. Radke, 217 Wis.2d at 45-46, 577 N.W.2d 366 (citing Professional Office Bldgs., Inc. v. Royal Indem. Co., 145 Wis.2d 573, 585, 427 N.W.2d 427 (Ct.App. 1988)). "Wisconsin case law has taken the `harsh view' that `an obligation to pay the entire settlement or judgment is the automatic consequence of a finding of a breach of the duty to defend.'" Id. at 47, 577 N.W.2d 366 (citing Hamlin Inc. v. Hartford Accident & Indem. Co., 86 F.3d 93, 94 (7th Cir.1996)). "A breach of the duty to defend constitutes `a breach of contract which renders [the insurer] liable to the insured for all damages that naturally flow from the breach.'" Id. at 48, 577 N.W.2d 366 (quoting Newhouse, 176 Wis.2d at 837, 501 N.W.2d 1). "Damages which naturally flow from an insurer's breach of its duty to defend include: (1) the amount of the . . . settlement against the insured plus interest; (2) costs and attorney fees incurred by the insured in defending the suit; and (3) any additional costs that the insured can show naturally resulted from the breach." Id. at 48-49, 577 N.W.2d 366 (quoting Newhouse, 176 Wis.2d at 838, 501 N.W.2d 1) (omission in Radke). "Policy limits do not restrict the damages recoverable by an insured for a breach of the contract by the insurer." Id. at 49, 577 N.W.2d 366 (citation omitted). Accordingly, if coverage of each insured was fairly debatable, then Travelers is responsible *108 for all damages naturally flowing from its breach of the duty to defend, not limited by any policy limits.
¶ 45 As we described previously, the trial court exhaustively analyzed the allegations of the Amended Complaint in reference to Travelers' policy. Although we are not bound by a trial court's interpretation of documents, see Povolny v. Totzke, 2003 WI App 184, ¶ 14 n. 3, 266 Wis.2d 852, 668 N.W.2d 834, we find the trial court's analysis here to be helpful, thorough and accurate.
¶ 46 As discussed above, only one claim need arguably be covered by the policy in order to trigger the duty to defend. Grube, 173 Wis.2d at 72, 496 N.W.2d 106. The District's allegations of negligence by HCH and Mitsubishi are covered under a Commercial General Liability policy where performance of a duty is required by the contract giving rise to the insurance. See American Family Mut. Ins. Co. v. American Girl, Inc., 2004 WI 2, ¶ 41, 268 Wis.2d 16, 673 N.W.2d 65 ("[T]here is nothing in the basic coverage language of the current CGL policy to support any definitive tort/contract line of demarcation for purposes of determining whether a loss is covered by the CGL's initial grant of coverage."). Travelers' policy provides broader coverage for the insureds than the original policy because the District purchased the extra three-year "Products-Completed Operations" endorsement at the conclusion of construction. The "property damage" to "your work" and damages by subcontractors (such as Mitsubishi) limitations are not applicable to the finished work covered by the three-year endorsement.
¶ 47 The trial court concluded that "[Travelers'] duty to defend all three flows from the amended complaint of the District to the extent of the District's claims against Mitsubishi and also to the extent of HCH's contractual insured contract with regard to Mitsubishi." The negligence of both were arguably covered by at least the Products-Completed Operations coverage because the negligence was alleged to have caused property damage defined in the policy as "[p]hysical injury to tangible property, including all resulting loss of use of that property" from one or more "occurrence" of "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," resulting in damage to various parts of the completed stadium. Mitsubishi's negligent actions as a subcontractor and HCH's negligent supervision of Mitsubishi were not excluded under the Products-Completed Operations coverage. The trial court also concluded "that the reiterated counterclaims of Mitsubishi and HCH draw in the amended complaint allegations of the District, and the cross-complaint of HCH to Mitsubishi certainly reiterates and draws in the alleged negligence of Mitsubishi for which HCH is contractually responsible." The District explained by example the intertwined nature of the Amended Complaint and the counterclaims:
A portion of the extra costs that [Mitsubishi] allegedly incurred, and for which it sought reimbursement from the District, related to the pivot bearings, the bogies, the truss end walls, and other roof components that the District alleged were defective. It was the District's position that if the pivot bearings, bogies and other roof components were defective, then [Mitsubishi] could not recover the extra costs that [Mitsubishi] allegedly incurred in fabricating and installing them. For this reason, all of the costs incurred by the District in prosecuting the liability portion of its claim that certain roof components were defective were also part of the District's defensive effort.
*109 ¶ 48 Travelers argues that it had no duty to defend the District because the counterclaims made by HCH and Mitsubishi are for design changes and cost overruns, which are not covered by the policy. However, as we noted, the trial court closely examined the counterclaim allegations in the context of the Amended Complaint and determined that the counterclaims were so inexorably intertwined with the Amended Complaint that defense of the District was also required.[20] For the reasons explained by the trial court, we independently conclude that Travelers owed a duty to defend to the District against the HCH and Mitsubishi counterclaims, to Mitsubishi and HCH both against the District claims and for their cross-claims against each other.
B. Award of attorney fees
1. Allocation of fees
¶ 49 We have previously approved a trial court's exercise of discretion in an award of attorney fees specifically authorized by statute, under Wisconsin's "lemon law," which award included fees incurred that were not authorized under the statute (i.e., breach of warranty claims), but where the trial court found that the two claims were "inextricably intertwined." Hughes v. Chrysler Motors Corp., 188 Wis.2d 1, 17-18, 523 N.W.2d 197 (Ct.App.1994).
¶ 50 Lacking a prior similar case in Wisconsin, the trial court in the instant case considered and applied the logic of a very similar situation in Hebela v. Healthcare Insurance Co., 370 N.J.Super. 260, 851 A.2d 75 (2004). In Hebela, the New Jersey court dealt with the responsibilities of an insurance company when one of its insureds sued another of its insureds. Id. at 78. The insurance company denied coverage and refused to defend against the counterclaim, resulting in a claim for breach of the duty to defend. Id. at 78. The court concluded, based on the policy language, that the insurance company was required to defend both insureds, and rejected the insurance company's argument that the costs of defense must be strictly limited to defense of allegations involving covered claims. Id. at 83 ("When the defense costs cannot be apportioned, the insurer must assume the cost of the defense for both covered and non-covered claims."). The court recognized that "there will be cases in which defense costs cannot be fairly apportioned" and that "courts will rarely be able to determine the allocation of defense costs with scientific certainty." Id. Further, in order to provide the insured with the "full benefit of the duty to defend," the court held that it "should not reduce that amount because the same services were rendered, or benefited, [one insured] against the [other insured] on [its] complaint." Id. at 85. The New Jersey court also refused to allow the breaching insurance company to now object to strategic decisions made during the litigation, stating:
Having chosen not to honor its obligation, [the insurance company] should not now be heard to complain that the counterclaim had no merit and would have been swiftly dismissed if a motion for summary judgment had been sooner filed. The strategic steps taken by [the insured] in defense of the counterclaim, after [the insurance company's] wrongful default, should not be second guessed if, in hindsight, a more expedient path *110 toward a favorable resolution on the merits was possible.
Id. at 86.
¶ 51 The trial court here found that it was impossible to completely separate offensive claims from defensive actions because of the significant factual and legal overlap, but determined that the allocation of fees and costs set forth in agreements between Federal and the insureds did so, insofar as it was possible to reasonably do so. Travelers has received over seven million dollars in credit which Federal and the insureds agreed was a reasonable approximation of the costs of offensive claims. We conclude that the trial court properly exercised its discretion when it found that this offset is reasonable and that Travelers is not entitled to further retrospective litigation about allocation of the voluminous bills and invoices generated after it breached its duty to defend.
2. Reasonableness of fees and litigation costs
¶ 52 Determination of reasonable attorney fees, awarded in a declaratory judgment for breach of a duty to defend, is a matter for the court. See WIS. STAT. § 806.04(8); Kolupar, 275 Wis.2d 1, ¶ 22, 683 N.W.2d 58; Elliott v. Donahue, 169 Wis.2d 310, 314, 485 N.W.2d 403 (1992). Applying the factors enumerated in SCR 20:1.5(a) to determine reasonableness of attorney fees awarded in litigation is to be done in the framework and methodology explained in Hensley, 461 U.S. at 433-34, 103 S.Ct. 1933 and Kolupar, 275 Wis.2d 1, ¶ 30, 683 N.W.2d 58. The party seeking attorney fees bears the burden of demonstrating that the amount of fees requested is reasonable. Id., ¶ 34, 683 N.W.2d 58 (citing Milwaukee Rescue Mission, Inc. v. Redevelopment Auth. of City of Milwaukee, 161 Wis.2d 472, 494, 468 N.W.2d 663 (1991)). "`The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services.'" Kolupar, 275 Wis.2d 1, ¶ 28, 683 N.W.2d 58 (quoting Hensley, 461 U.S. at 433, 103 S.Ct. 1933). This figure is often referred to as the "lodestar." Id., ¶ 29, 683 N.W.2d 58. The party seeking the award of fees must first submit evidence supporting the hours worked and the rates claimed. Id., ¶ 31, 683 N.W.2d 58.
¶ 53 Once the lodestar figure has been determined, analysis of the eight-factors set forth in Fireman's Fund Ins., 261 Wis.2d 4, ¶ 67, 660 N.W.2d 666, is appropriate. These factors are: (1) "the amount and character of the services rendered;" (2) "the labor, time, and trouble involved;" (3) "the character and importance of the litigation;" (4) "the amount of money or value of the property affected;" (5) "the professional skill and experience called for;" (6) "the standing of the attorney in the profession;" (7) "the general ability of the client to pay;" and (8) "the pecuniary benefit derived from the services." Id. (citation omitted).
¶ 54 A "court need give only a `concise but clear explanation of its reasons for the fee award when the reasonableness [of the requested fee] is challenged.'" Kolupar, 275 Wis.2d 1, ¶ 52, 683 N.W.2d 58 (quoting Hensley, 461 U.S. at 437, 103 S.Ct. 1933) (alteration in Kolupar). A "discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." Hartung, 102 Wis.2d at 66, 306 N.W.2d 16.
*111 ¶ 55 Travelers would have us remand this case for an evidentiary hearing on the reasonableness of the attorney fees and costs; we decline to do so. The trial court here considered and made a record of all of the relevant factors.[21] It performed a reasonable sampling of thousands of pages of bills and invoices. The trial court calculated the hourly rate for attorneys whose work it had personally observed and found both the rate and the time reasonable. It described the complexity of the litigation, the exceptional quality of the services rendered, the financial value to each client of the results obtained in view of the amounts originally at stake, and it discussed the skill and professional standing of the attorneys involved. After considering all of those factors, as it was required to do, the trial court made the award challenged here. The record demonstrates that the trial court applied the correct law, exercised its discretion based on facts in the record, and explained the facts upon which it relied to come to a reasoned determination that the fees and costs were reasonable.
¶ 56 The record also demonstrates that Travelers had fair opportunity to retain an expert witness (which it did), and had sufficient time to examine voluminous data relating to attorney fees and costs (which both Travelers and its expert did) and to produce a lengthy report by the retained expert (which the trial court considered and rejected). The record further establishes that Travelers knew, at the conclusion of the October 25, 2004 hearing when it was found to have breached its duty to defend, that the next hearing was for the court to determine the damages, and the reasonable attorney fees and costs claimed by Federal and the insureds.
¶ 57 The trial court, when providing Travelers with additional discovery related to attorney fees and costs, later gave Travelers more time to prepare for the fees hearing. For Travelers to now argue that it had inadequate time to prepare its challenge to the reasonableness of fees and costs rings exceedingly hollow. Not only did it retain an expert witness who, with associates, reviewed thousands of pages of documents, and from whom it received a lengthy report, but Travelers also reviewed those documents and objected to numerous specific fees and costs. We find no inappropriate exercise of discretion by the trial court when it enforced the scheduling limits previously set and already extended.
¶ 58 Had Travelers performed its duty to defend, even under a reservation of rights, it could have imposed such cost controls or billing methods, and made such strategic litigation decisions, as it thought appropriate. However, by refusing to participate in the defense, Travelers cannot now be heard, after the fact, to object to arms-length strategic and logistic decisions that were made by Federal, the District, HCH and Mitsubishi. Travelers forfeited the right to control the defense. Hebela, 851 A.2d at 86. The trial court properly refused to allow Travelers, after the fact, to question defense strategy or the necessity of strategic or logistic decisions. The trial court gave Travelers sufficient opportunity to challenge billing items that did not involve strategic decisions. In fact, as we have seen, Travelers successfully challenged over two hundred thousand dollars of fees and costs.
¶ 59 We have previously approved contracts which allocate unearned contingent *112 fees on a percentage basis between the original attorney and subsequent attorney. See Markwardt v. Zurich Am. Ins. Co., 2006 WI App 200, 296 Wis.2d 512, 724 N.W.2d 669; Piaskoski & Assocs. v. Ricciardi, 2004 WI App 152, 275 Wis.2d 650, 686 N.W.2d 675. When we have approved such agreements, the fees must be reasonable, the agreement must have been negotiated between sophisticated parties, the agreement must have avoided the necessity and uncertainty of potentially lengthy and expensive litigation and the agreement must have provided a significant economy of judicial resources. We, therefore, perceive no reason of policy to prohibit reasonable agreements, negotiated at arms length between insurers and sophisticated insureds who wish to allocate fees and costs between offensive and defensive claims involved in a duty to defend. Such agreements avoid the risk and expense of litigation to resolve allocation of those fees and costs. Where, as here, the trial court is intimately familiar with all of the details of the litigation, has examined the allocation agreements, has determined that the agreements were negotiated at arms length and represent a reasonable allocation of costs, and has stated reasons for those findings, we will uphold such agreements.
¶ 60 Travelers' persistent refusal to perform its duty to defend, after repeated specific rulings by the trial court that it had that duty, prevents it from now challenging the arms-length agreements by which Federal and the insureds agreed to offset their offensive claims costs by applying a percentage reduction to their total attorney fees and costs. The trial court found that the agreements were negotiated at arms length, that they were a reasonable way to allocate these charges in an extraordinarily complex and intertwined series of claims, and that the agreements saved Travelers over seven million dollars. We recognize the enormous additional cost all parties would have to endure if they are forced, as Travelers asks, to litigate line by line, day by day, the reasonableness and necessity of all of the legal services provided from June 3, 2003, through the last trial court hearing in this case. We see no reason of policy or law to impose this further burden on the court or the parties.
C. Federal entitled to reimbursementnot contribution.
¶ 61 Travelers argues that because Federal had a duty to defend the crane collapse claims, Federal retained the duty to defend all subsequent claims, and is, therefore, entitled to no "contribution" from Travelers. This argument suffers from several flaws. First, Travelers was found to have a duty to defend grounded in the Amended Complaint and related pleadings, but not including the crane collapse claims. Travelers, not Federal, is the primary insurer. Thus Travelers, not Federal, is obligated to defend all claims. Radke, 217 Wis.2d at 43, 577 N.W.2d 366; Newhouse, 176 Wis.2d at 835, 501 N.W.2d 1. Further, Travelers, not Federal, has been found in breach of its duty to defend. Because of this breach, Travelers lost several rights, including the right to dispute coverage. See Radke, 217 Wis.2d at 48-49, 577 N.W.2d 366. The insuredsthe District, HCH and Mitsubishiassigned their rights against Travelers to Federal in the agreements allocating offensive claims as a percentage of total claims which we explained previously. Thus, Federal is now entitled to enforce those rights, whether arising out of the contractual duty to defend, or the breach of that duty by Travelers.
¶ 62 Travelers argues that it owes Federal nothing because Wisconsin prohibits *113 contribution by one insurer (Travelers) to the defense costs of another (Federal) when both have a duty to defend. In support of that argument, Travelers relies on Loy v. Bunderson, 107 Wis.2d 400, 320 N.W.2d 175 (1982) and Teigen v. Jelco of Wisconsin, Inc., 124 Wis.2d 1, 367 N.W.2d 806 (1985). The reliance is misplaced. As we have explained, Federal had no duty to defend the claims arising out of the Amended Complaint and related pleadings. Only Travelers had such a duty. Federal is not seeking "contribution" towards an expense for which both were partially responsible, but rather, is seeking reimbursement for the payments it made as an excess carrier because Travelers, the primary carrier, refused to honor its obligations to defend its insureds. As Teigen points out, "the excess insurer's right to recover is predicated on the primary insurer's breach of its duty to its insured." Id., 124 Wis.2d at 11, 367 N.W.2d 806. Teigen supports the excess insurer's (Federal's) right to recover based on the primary insurer's (Travelers') established breach of its duty to its insureds.
¶ 63 The supreme court in Loy refused to allow an excess carrier to force a primary carrier to continue to defend where the settlement agreement between the primary carrier and the insured insulated the excess carrier from all liability up to the limits of the primary policy. Id., 107 Wis.2d at 429-30, 320 N.W.2d 175. Here, Travelers cites Loy for the argument that "contribution" between insurance carriers is not permitted, which misconstrues both Loy and this case. Travelers' reliance on Loy depends on the accuracy of Travelers' contention that Federal is asking Travelers for a contribution which, as we have explained, mischaracterizes the facts and the legal status of Travelers and Federal.
¶ 64 Finally, Travelers urges that we remand for a new hearing to divide defense costs between it and Federal, arguing that Wisconsin should adopt the equitable contribution approach discussed by the California Court of Appeals in Maryland Casualty Co. v. Nationwide Mutual Insurance Co., 81 Cal.App.4th 1082, 97 Cal.Rptr.2d 374 (2000). We decline Travelers' invitation to thrust the trial court into this new, and in this case unnecessary, sea of litigation. In Maryland Casualty Co., the California court dealt with two insurers that it considered occupied an equal level of liability to the insureds, id. at 377-78, which is not the situation here.[22] Wisconsin's courts have never, so far as we have been able to determine, ordered division of defense costs between two insurance carriers when only one of the carriers has a primary contractual duty to defend the claims presented. We perceive no good policy reason to reward Travelers (the only primary insurer after the date of the Amended Complaint) for its repeated refusal to defendeven after being repeatedly told it had a contractual duty to do soby reducing the amount the trial court has determined it owed. Such reduction would reward a primary carrier for a wrongful refusal to defend and create *114 something akin to a litigation expense game of "chicken"with offsets going to the obligated primary insurer who breached its duty. Travelers is not entitled either by contract or equitable principles to reduce its obligations because an excess carrier, Federal, performed a duty that belonged to Travelers but which Travelers refused to honor.

CONCLUSION
¶ 65 We conclude that Travelers had a duty to defend the District, HCH and Mitsubishi beginning on the date of the Amended Complaint. We also conclude that on the face of the pleadings in this case, although some claims were purely offensive, the offensive and defensive claims between and among the District, Mitsubishi and HCH were inextricably intertwined. Consequently, we conclude that the trial court properly exercised its discretion in finding that percentage reductions of litigation fees and expenses agreed upon between Federal and Travelers' insureds reasonably reduced the litigation fees and expenses to offset the cost of the purely offensive claims. Further, we conclude that the trial court properly exercised its discretion in determining those reasonable attorney fees, litigation costs and damages which naturally flowed from Travelers' breach of its duty to defend.
Judgment affirmed.
NOTES
[2] First Excess, Royal Insurance Company of North America ($2 to $7 million); Second Excess, Indemnity Insurance of North America ($7 to $27 million); Third Excess, Federal Insurance Company ($27 to $77 million); Fourth Excess, Travelers ($77 to $102 million).
[3] The policy commencement date was April 1, and the expiration date of each twelve-month policy was March 31 of the following year.
[4] If the underlying insurer has refused to defend, asserting that there is no coverage under the substantive provisions of the underlying policy, the excess insurer will have a duty to defend, provided there is coverage under the excess policy and the claim falls within the policy limits of the excess insurer.

American Motorists Ins. Co. v. Trane Co., 544 F.Supp. 669, 692 (W.D.Wis.1982).
[5] The trial court refused to adopt Travelers' characterization. The following exchange between counsel for Travelers and the court illustrates Travelers' position as to the relationship between Travelers and Federal.

TRAVELERS' COUNSEL: Granted, the rulings are that Federal and Travelers now share that primary role, but they are co-primary, and that is an important thing to remember when 
THE COURT: That is not this Court's ruling. That's your characterization.
TRAVELERS' COUNSEL: That's my characterization of the Court's ruling.
THE COURT: That is clearly not my ruling.
[6] This provision has been referred to in some briefs as a "pay and walk" clause, the validity of which is challenged in one respondent brief. Because our conclusion on other issues resolves this case, we need not decide this issue. See Patrick Fur Farm, Inc. v. United Vaccines, Inc., 2005 WI App 190, ¶ 8 n. 1, 286 Wis.2d 774, 703 N.W.2d 707.
[7] Indeed, when confirming that Travelers had no duty to defend the crane collapse claims, the trial court often referred to Travelers as the "primary insurer" ("based upon you being the primary insurer, not getting into whether you exhausted your coverage or not. . . ."; speaking to Travelers' counsel: "But under you being the primary insurer in this case. . . . ").
[8] This additional coverage is found in the Products and Completed Operations Extention [sic] endorsement, the Amendment of Exclusion "L," statement of Commercial General Liability Coverage and the Exclusion (L).
[9] These rulings occurred March 25, 2004, September 1, 2004, and October 25, 2004.
[10] The transcript refers to "medical" particles, an obvious typographical error.
[11] The trial court read the second paragraph of Travelers' motion which stated:

There is no duty to defend any of the claims on the grounds such allegations are either, 1. Arising out of breach of contract claims and do not constitute property damage caused by an occurrence, or, 2. Even if there is property damage caused by an occurrence, such damages are excluded from coverage, et cetera.
[12] The court stated:

[T]he precise legal question . . . is whether, when the Court orders indemnification for a failure or a breach of the duty to defend, whether, then, the party ordered, in this case Travelers, gets to attack the fees paid on reasonable and necessary grounds. . . . They didn't defend, they didn't get involved, they didn't reserve their rights and defend. They weren't successful in getting a stay and bifurcation, and so they never participated, and now, to allow them this long after the fact, to go back and second-guess what Federal did pay on reasonable and necessary grounds does seem facially absurd.
[13] According to CCAP records, between February 2, 2004, when the trial court was assigned this case, and the April 15, 2005 ruling, the court had received fifty-seven motions and conducted twenty-five hearings. Additionally, at oral argument, this court requested that the parties provide information relating to the calculation of time the trial court spent on this matter. In a letter dated May 11, 2007, counsel for Federal provided the following information:

Judge Brennan conducted 12 hearings. The transcripts from those hearings run 846 pages. Judge Brennan conducted an additional 11 telephone conferences with the parties, transcripts of which are not in the record.
Judge Brennan entered 49 orders, totaling 175 pages.
Judge Brennan received 221 motions and/or briefs related to those motions.
Judge Brennan received 61 letters from the parties (not counting pro-forma transmittal letters), totaling 209 pages. The parties submitted 741 pages in pretrial materials, not counting motions in limine and briefs thereon.
Travelers, in a letter dated May 16, 2007, from counsel for Travelers to this court, responded to the information provided by Federal, noting: "Travelers does not dispute the data in Federal's May 11 submission (although we have not independently verified it)."
[14] The court observed:

I clearly ordered that if Travelers wanted an expert, they were to notify the Court. They didn't. They didn't follow the procedure. And just like I would do in any Civil Division scheduling order, I should disallow [Hansen's affidavit] entirely. . . . I did read it because I can't help myself. I read everything you guys submit to me. . . . [Hansen] can't tell me, from reviewing things for 200 or 400 hours, that he knows more about the interrelationship of these claims and defenses than I do. I know. And he doesn't.
[15] The difference between the total fees incurred and the amount paid by Federal results from two sequential agreements between Federal and the three insureds. These agreements, negotiated by Federal, reduced the amount to be paid by a percentage of the total fees and costs in order to accommodate the offense portions of the various claims by each insured. These agreements reduced the total litigation expenses due to the insureds by approximately $7,300,000.
[16] The trial court pointed out that Travelers' expert, Hansen, was able to spend "200 to 400 hours doing whatever Travelers wanted him to do on the case," and that Travelers could have had Hansen looking at the reasonableness of the fees and costs since Travelers had "known since February that [the court] was ruling on reasonableness" on April 15.
[17] Among other costs to which Travelers objected were fees to a paralegal firm jointly retained by the parties to scan and date-stamp three million documents, multiple people questioning the Japanese document translators, a database search to permit ongoing management of deposition testimony, air travel charges, and substantial time for an attorney who, in preparation for a witness deposition, reviewed "a hundred thousand documents," all authored by that witness.
[18] During briefing on this matter, Federal filed a motion to strike portions of Travelers' reply brief. Federal specifically moved this court to strike Travelers' argument: (1) on pages 17-18 of its reply brief relating to a credit against the monies the court determines Travelers owes Federal to which Travelers argues it is entitled because of its payment of settlement proceeds to the insureds; and (2) on pages 30-33, where Travelers argues that it is relieved of any duty to defend because two exclusions in its policy of insurance apply. As noted in the body of this opinion, we have affirmed the trial court's findings that none of the policy exclusions are applicable and that Travelers is not entitled to any credit for its payment of settlement proceeds. Accordingly, although Federal correctly notes that Travelers did not raise these matters in its opening brief, no further action will be taken on this motion.
[19] After oral argument in this case, this court decided Sustache v. American Family Mutual Insurance Co., 735 N.W.2d 186 (Wis.App. 2007), recommendation for publication pending. Travelers brings this case to our attention, arguing that our conclusion in Sustache that we are limited to analysis of the four corners of the complaint requires that Travelers prevail here. Travelers' reading is too narrow, and ignores our repetition of the supreme court summary of the four-corners rule: "It is the nature of the claim alleged against the insured which is controlling even though the suit may be groundless, false or fraudulent." Sustache, No. 06AP939, slip op. ¶ 10 (citing Grieb v. Citizens Cas. Co. of N.Y., 33 Wis.2d 552, 558, 148 N.W.2d 103 (1967)). There is no requirement in the four-corners rule that the claim against the insured be alleged only in a complaint, although if only the defendant is the insured, that may be the fact in a specific case.
[20] The trial court found: "The only one, it could be said fairly, that had a truly purely offensive claim initially was the District. But once Mitsubishi responded as they did, and everybody else got involved, that immediately changed the character of the District's involvement in this case as well."
[21] Travelers did not claim an inability to pay the defense costs, nor did the trial court discuss that factor.
[22] Moreover, were we to adopt the alternative approach of equitable subrogation discussed and rejected in Maryland Casualty Co. v. Nationwide Mutual Insurance Co., 81 Cal. App.4th 1082, 97 Cal.Rptr.2d 374 (2000), Travelers' claim would still fail. Travelers has paid nothing toward defense of any of its insureds. The California court noted that equitable subrogation allows "an insurer who paid coverage or defense costs to be placed in the insured's position to pursue a full recovery from another insurer who was primarily responsible for the loss," and pointed out that "an excess insurer that pays defense costs will frequently obtain a full recovery against the primary insurer on an equitable subrogation theory." Id. at 377. The concepts discussed in Maryland Casualty Co. support Federal's claims, not Travelers.