JOHNSON CONTROLS, INC.,
Plaintiff-Respondent,

v.

LONDON MARKET,
Defendant-Appellant,†

AIU INSURANCE COMPANY, American Home
Assurance Company, Granite State Insurance
Company, Landmark Insurance Company and
National Union Fire Insurance Company of
Pittsburgh, PA, Defendants-Intervenors,

ALLSTATE INSURANCE COMPANY, Allianz Underwriters
Insurance Company, Affiliated FM Insurance
Company, American Employers' Insurance
Company, American Motorists Insurance
Company, Associated International Insurance
Company, Central National Insurance Company
of Omaha, Employers Mutual Casualty Company,
Employers Reinsurance Corporation, Federal
Insurance Company, Highlands Insurance
Company, Industrial Indemnity Company,
International Surplus Lines Insurance Company,
International Insurance Company, Westport
Insurance Corporation, Stonewall Insurance
Company, TIG Insurance Company, Transamerica
Premier Insurance Company, United National
Insurance Company and Westchester Fire
Insurance Company, Defendants.

† Motion for Reconsideration pending.

176

Supreme Court

*No. 2007AP1868. Oral argument February 23, 2010.
—Decided June 24, 2010.*

2010 WI 52

(Also reported in 784 N.W.2d 579.)

180

For the defendant-appellant there were briefs by *Christopher J. Johnson and Beck, Chaet, Bamberger & Polsky, S.C.*, Milwaukee; *Patrick T. Walsh and Hinkhouse Williams Walsh LLP,* Chicago, Ill.; and *Susan R. Tyndall and CMT Legal Group, LTD.*, Waukesha, and oral argument by *Susan R. Tyndall.*

For the plaintiff-respondent there were briefs by *William M. Cannon, Mark L. Thomsen, Allan M. Fo-*

eckler, Brett A. Eckstein, and Cannon & Dunphy, S.C., Brookfield, and oral argument by *Mark L. Thomsen*.

For the defendants-intervenors there was a brief by *Anne Berleman Kearney and Appellate Consulting Group*, Milwaukee, and *Margaret J. Orbon, Ilene M. Korey, and Clausen Miller P.C.*, Chicago, Ill., and oral argument by *Anne Berleman Kearney*.

An amicus curiae brief was filed by *Lynn R. Laufenberg and the Laufenberg Law Group, S.C.*, Milwaukee, on behalf of the Wisconsin Association for Justice.

An amicus curiae brief was filed by *Erin O'Connor and O'Connor Law Offices, LLC*, Fox Point, on behalf of the Metropolitan Milwaukee Association of Commerce.

An amicus curiae brief was filed by *Thomas R. Schrimpf and Hinshaw & Culbertson LLP*, Milwaukee, and *Laura A. Foggan and Wiley Rein LLP*, Washington, D.C., on behalf of Complex Insurance Claims Litigation Association, American Insurance Association, and Wisconsin Insurance Alliance.

¶ 1. ANN WALSH BRADLEY, J. This case is before the court on certification from the court of appeals[1] pursuant to Wis. Stat. § (Rule) 809.61 (2007–08).[2] We are asked to determine whether London Market had a duty to defend Johnson Controls. If it did, we then must determine when, if at all, that duty was triggered.

¶ 2. London Market contends that it had no duty to defend Johnson Controls because its insurance policy

---

[1] London Market filed for partial summary judgment. The circuit court for Milwaukee County, Patricia D. McMahon, Judge, denied London Market's motion. The court of appeals granted leave to appeal and ultimately certified the case to this court.

[2] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

is an indemnity-only excess umbrella policy that does not promise a defense. Further, it asserts that the duty to defend set forth in the underlying Travelers insurance policies is not incorporated into the London Market excess policy.

¶ 3. In the alternative, London Market asserts that even if it had a duty to defend under the policy, that duty was never triggered because it is conditioned upon exhaustion of the underlying insurer's policy limits, and those limits were never exhausted. Further, London Market contends that Wisconsin law did not require it to drop down and defend Johnson Controls when the underlying insurer refused to defend.

¶ 4. Based on the language of the policies, we conclude that London Market had a duty to defend. Although its excess umbrella policy does not have a duty to defend provision, it does contain a follow form provision that incorporates the duty to defend found in the underlying Travelers policies.

¶ 5. We further determine that its duty to defend was not conditioned upon exhaustion of the underlying Travelers policies. Rather, under the terms of the "other insurance" provision, London Market's duty to defend was triggered when the underlying insurer "denie[d] primary liability under its policy." Accordingly, we affirm the circuit court and remand for further proceedings.

I

¶ 6. Johnson Controls is a manufacturing company based in Milwaukee, Wisconsin. During the 1970s, it contracted with various insurers for a layered program of primary, umbrella, and umbrella excess commercial general liability (CGL) policies. This appeal

specifically involves the umbrella excess policy issued to Johnson Controls by London Market, effective from December 31, 1973, to December 31, 1976 (the 1973–1976 London Market policy). The London Market excess umbrella policy sat atop three successive policies issued by Travelers Indemnity Company (Travelers).

¶ 7. Before delving into the specific issues presented, it is helpful to provide some historical background about this case, which has been ongoing for over 21 years. In the mid-1980s, Johnson Controls started to receive notification that it had been identified as a potentially responsible party (PRP) in connection with environmental contamination at various sites across the country.[3] As a PRP, Johnson Controls could be required to contribute to the environmental restoration and remediation costs at these sites.

¶ 8. Johnson Controls asserts that it notified its insurers, seeking defense and indemnification.[4] The insurers refused to provide defense or indemnification, justifying their refusal on the ground that their CGL policies did not cover environmental restoration and remediation costs imposed under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).[5]

¶ 9. In 1989, Johnson Controls filed suit against its various primary, umbrella, and excess insurers. It

---

[3] Some of the sites were lead smelting plants where Johnson Controls delivered lead acid batteries for recycling. Others were contaminated landfills. *Johnson Controls v. Employers Ins. Wausau (Johnson Controls III)*, 2003 WI 108, ¶ 7, 264 Wis. 2d 60, 665 N.W.2d 257.

[4] *Id.*, ¶ 10. Whether and when notification was tendered to each of its insurers are fact questions that have not been resolved by the circuit court.

[5] *Id.*

sought a declaratory judgment that its insurers were obligated to provide defense and indemnification under the terms of the insurance policies. London Market, like many of the other insurers, answered and filed a motion for partial summary judgment.

¶ 10. Before the circuit court made a determination on the insurers' obligations, this court decided *City of Edgerton v. General Casualty Co. of Wisconsin,* 184 Wis. 2d 750, 517 N.W.2d 463 (1994). In that case, this court determined that environmental response costs under CERCLA constitute "equitable relief" rather than legal damages and that a CGL insurer has no duty to indemnify the insured for these expenses. *Id.* at 782, 784. Further, this court determined that the receipt of a PRP letter or comparable letter from a state agency did not constitute a "suit," and therefore a CGL insurer's duty to defend was not triggered by the receipt of a PRP letter. *Id.* at 771.

¶ 11. The circuit court applied the holding of *Edgerton* and granted summary judgment in favor of the insurers. It determined that there was no duty to defend or indemnify Johnson Controls under any of the CGL policies. The court of appeals affirmed in an unpublished decision, noting that "as long as *City of Edgerton* remains the law in this state" Johnson Controls could not prevail. *Johnson Controls v. Employers Ins. of Wausau (Johnson Controls I),* Nos. 95–179, 95–2591, unpublished slip op. at 4 (Wis. Ct. App., Oct. 13, 1998).

¶ 12. The court of appeals remanded to the circuit court for factual determinations of whether all the sites fit within the rule outlined above. On remand, the circuit court determined that there was no coverage under any of the policies for any of the contaminated sites.

¶ 13. Johnson Controls again appealed. In 2002, the court of appeals determined that none of the circuit court's findings of fact was erroneous. It concluded: "Although Johnson Controls argues that *Edgerton* was decided wrongly, we are obligated to follow its dictates." *Johnson Controls v. Employers Ins. of Wausau* (*Johnson Controls II*), 2002 WI App 30, ¶ 5, 250 Wis. 2d 319, 640 N.W.2d 205 (Ct. App. 2001).

¶ 14. In 2003, this court reviewed the *Johnson Controls II* decision and reversed. Overruling *Edgerton,* the court concluded that an insured's costs for "restoring and remediating damaged property, whether the costs are based on remediation efforts by a third party (including the government) or are incurred directly by the insured, are covered damages under applicable CGL policies, provided that other policy exclusions do not apply." *Johnson Controls v. Employers Ins. Wausau* (*Johnson Controls III*), 2003 WI 108, ¶¶ 4–5, 264 Wis. 2d 60, 665 N.W.2d 257.

¶ 15. It also concluded that *Edgerton's* discussion of the insurer's duty to defend in the context of CERCLA letters was "unworkable." *Id.,* ¶ 4. The court determined that PRP letters constitute "the functional equivalent of a suit" because a PRP letter "marks the beginning of adversarial administrative legal proceedings that seek to impose liability upon an insured." *Id.,* ¶¶ 5, 120. Therefore, the receipt of such a letter triggers the insurer's duty to defend. *Id.,* ¶ 120.

¶ 16. Finally, the court stated that "[a]lthough this court would like to end this action after more than 13 years of litigation, we must remand the cause for further proceedings[.]" *Id.,* ¶ 123. The circuit court was instructed to determine whether other exclusions in the policies might apply and to determine the liability of the various insurers. *Id.*

¶ 17. Johnson Controls asserts that on remand, its case management strategy was to first seek judgments against those defendant insurers that had a duty to defend in addition to a duty to indemnify. In 2005, Johnson Controls filed a motion for declaratory judgment against Employers Insurance of Wausau, one of its primary insurers, asserting that it had breached its duty to defend and seeking reimbursement for remediation and defense costs in excess of $150 million. Johnson Controls settled its claims with Employers. Then, it filed a similar motion against another of its insurers. In the interim, Johnson Controls entered settlement agreement with several insurers, including Travelers, the insurer underlying the 1973–1976 London Market policy.

¶ 18. At some point, it became apparent that Johnson Controls planned to file a similar motion for declaratory judgment against London Market. In January 2007, London Market moved for partial summary judgment. It contended that its policy was an indemnity-only excess umbrella insurance policy that contained no promise of defense.

¶ 19. In its motion in support of partial summary judgment, London Market stated: "In order to resolve this issue so that the parties can address the real coverage questions—whether the London policy indemnifies [Johnson Controls] for any of the [] pollution sites—London Market Insurers move this Court for a ruling, as a matter of law, that London Market Insurers' excess umbrella liability policy does not contain a duty to defend." In the alternative, London Market sought a declaration that "if the Court believes the London policy does have a duty to defend, the duty would not ripen unless and until the underlying policies have been exhausted."

¶ 20. The circuit court concluded that London Market's follow form provision incorporated the duty to defend found in the Travelers policies. Further, it concluded that "[n]othing in the policy suggests [London Market's] duty to defend is conditioned on exhaustion of the [underlying Travelers] policy." "[G]iven the failure of Travelers to provide a defense, [London Market] at a minimum has an obligation to drop down and provide a defense. To hold otherwise would encourage insurers to breach their independent duties to defend whenever an underlying insurer refuses to defend and leave insureds without a defense for which they paid. I think that is contrary to public policy expressed in appellate decisions in the state."

¶ 21. The court of appeals certified two questions to this court:

First, should a duty to defend be imported from an underlying umbrella insurance policy into an excess umbrella liability policy by language in the excess policy stating that it is subject to the same terms, definitions, exclusions and conditions as the underlying policy "except as otherwise provided"? . . .

Second, is the excess liability carrier's duty to defend primary in nature, such that it may be triggered even if the excess policy expressly requires exhaustion of the underlying policy as a precondition to liability and the underlying policy has not been exhausted?

The court of appeals explained that both issues were matters of first impression in Wisconsin and both would have broad implications for the business community and the insurance industry.

¶ 22. After we granted certification, five excess insurers involved in the litigation at the circuit court filed a motion to intervene under Wis. Stat. § 809.13,

stating that the issues before the court could affect not only London Market but their excess policies as well. We granted the defendant insurers' motion to intervene. However, we clarified that the order granting this motion "did not alter or expand the issues to be decided by this court, which relate to the circuit court's summary judgment regarding plaintiff-respondent, Johnson Controls, Inc., and defendant-appellant, London Market[.]"[6]

## II

¶ 23. This case requires us to determine whether the circuit court erred in denying London Market's motion for partial summary judgment. We review the circuit court's denial of a motion for partial summary judgment independently, but using the same methodology as employed by the circuit court. *Radke v. Fireman's Fund Ins. Co.*, 217 Wis. 2d 39, 42–43, 577 N.W.2d 366 (Ct. App. 1998). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; *see also* Wis. Stat. § 802.08(2).

¶ 24. Here, the parties dispute whether London Market had a duty to defend Johnson Controls under the terms of an insurance policy. If it did, the parties contest when, if at all, that duty was triggered. The construction of an insurance policy presents a question of law, reviewed independently of the determination rendered by the circuit court. *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 2009 WI 13, ¶ 27, 315 Wis. 2d 556, 759 N.W.2d 613.

---

[6] We do not determine here whether the defendants-intervenors' policies contain duties to defend, and if so, when (if at all) those duties were triggered.

¶ 25. An insurance policy is a contract for insurance. Policy language is construed as it would be understood by a reasonable person in the position of the insured. *Frost v. Whitbeck,* 2002 WI 129, ¶ 20, 257 Wis. 2d 80, 654 N.W.2d 225; *Kremers-Urban Co. v. Am. Employers Ins. Co.,* 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). Provisions in an insurance policy should not be read in isolation, but rather should be read in the context of the policy as a whole. *Badger Mut. Ins. Co. v. Schmitz,* 2002 WI 98, ¶ 61, 255 Wis. 2d 61, 647 N.W.2d 223. It is sometimes necessary to look beyond a single clause or sentence to capture the essence of an insurance agreement. *Folkman v. Quamme,* 2003 WI 116, ¶ 21, 264 Wis. 2d 617, 665 N.W.2d 857.

¶ 26. When the policy's language is unambiguous, we enforce the contract as written, without resorting to the rules of construction or principles from case law. *Plastics Eng'g Co.,* 315 Wis. 2d 556, ¶ 27. However, if the policy language is susceptible to more than one reasonable interpretation, it is ambiguous. *Id.* "[B]ecause the insurer is in a position to write its insurance contracts with the exact language it chooses—so long as the language conforms to statutory and administrative law—ambiguity in that language is construed in favor of an insured seeking coverage." *Froedtert Mem'l Lutheran Hosp. v. Nat'l States Ins.,* 2009 WI 33, ¶ 43, 317 Wis. 2d 54, 765 N.W.2d 251.

### III. Duty to Defend

¶ 27. We determine first whether London Market's policy contains a duty to defend. London Market asserts that its umbrella excess policy was an indemnity-only policy that did not promise a defense.

¶ 28. Contracts for insurance typically impose two main duties—the duty to indemnify the insured against damages or losses, and the duty to defend against claims for damages. The duty to indemnify and the duty to defend are separate contractual obligations. *Radke,* 217 Wis. 2d at 44. A policy may provide one without providing the other.

¶ 29. When a contract imposes a duty to defend, however, that duty is broader than the duty to indemnify. *Id.* The duty to defend arises when there is arguable, as opposed to actual, coverage under the policy. *Id.* It is the nature of the claim alleged against the insured which triggers the duty to defend—even though the suit may be groundless, false, or fraudulent. *Sustache v. Am. Family Mut. Ins. Co.,* 2007 WI App 144, ¶ 10, 303 Wis. 2d 714, 735 N.W.2d 186.

¶ 30. In support of its assertion that its policy does not provide a duty to defend, London Market advances that it is contrary to the role of an excess insurer and the purpose of excess insurance to provide a duty to defend. Such reliance on generalized statements about the role and purpose of excess coverage misses the mark.

¶ 31. Instead,. "[t]he duty to defend an insured is based on the language in the insurance contract." *Southeast Wis. Prof'l Baseball Park Dist. v. Mitsubishi Heavy Indust. Am. Inc.,* 2007 WI App 185, ¶ 41, 304 Wis. 2d 637, 738 N.W.2d 87; *see also Novak v. Am. Family Mut. Ins. Co.,* 183 Wis. 2d 133, 137, 515 N.W.2d 504 (Ct. App. 1994). In practice, most primary policies do contain a contractual duty to defend, and some umbrella and excess policies do as well. To determine

whether an insurer has a duty to defend, we examine the language of the policy.

¶ 32. London Market asserts that it promised indemnification only, and that it did not promise to defend. It points to its insuring agreement, which states that London Market agrees, "subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of" certain liabilities:

> Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability . . . for . . . Property Damage . . . arising out of the hazards covered by and as defined in the underlying [Travelers policies].

London Market's insuring agreement promises indemnification but is silent regarding defense.

¶ 33. London Market is correct that the language of the insuring agreement—read in isolation—does not impose an obligation to defend. However, this insuring agreement does not exist in isolation.

### A. Follow Form Policy

¶ 34. Rather, the excess umbrella policy issued by London Market is a "follow form" policy, meaning that the policy is relatively brief and incorporates many of the provisions of an underlying policy—in this case, the excess umbrella policies issued by Travelers.[7] One of the conditions "hereinafter mentioned" in the London Market policy is the follow form provision:

---

[7] "An excess policy may be written in two forms: as a stand-alone policy or as a policy that 'follows form.' . . . A stand-alone excess policy is an independent insuring agreement. In contrast, a follows form excess policy incorporates by reference the terms of the underlying policy and is designed to match the coverage provided by the underlying policy." 23 Eric

> This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and Limits of Liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying [Travelers policies] prior to the happening of an occurrence for which claim is made hereunder.

Thus, to determine the terms, definitions, exclusions, and conditions of the London Market policy, it is necessary to turn to the Travelers policies.[8]

¶ 35. Among other provisions, the underlying Travelers policies contain a duty to defend as well as a duty to indemnify:

> Liability. The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . , *and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury or damage* . . . , but the company shall not be obligated to pay any claim or judgment or to defend any suit filed after the applicable limit of the company's liability has been exhausted by payments of judgments or settlements.

(Emphasis added.)

¶ 36. To determine whether Travelers' duty to defend is incorporated into London Market's policy, we

---

Mills Holmes, *Holmes' Appleman on Insurance 2d* § 145.1 (interim vol. 2003); *see also* 2 Arnold P. Anderson, *Wisconsin Insurance Law* § 11.16 (5th ed. 2004).

[8] The dissent is critical of our reliance on terms in the Travelers policies. Dissent, ¶¶ 91, 94, 96. This criticism ignores the fact that the London Market policy specifically directs the insured and the court to refer to the Travelers policies when determining the "terms, definitions, exclusions and conditions" of coverage. Due to the nature of the follow form provision, the scope of London Market's contractual obligations cannot be understood without reference to the Travelers policies.

must examine the language of London Market's follow form provision. It states that the policy "is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and Limits of Liability and except as otherwise provided herein) as are contained in" the underlying Travelers policies.

¶ 37. London Market's follow form provision does not expressly disclaim the duty to defend found in the Travelers policies. Rather, it explicitly sets forth three ways in which the London Market policy differs from the underlying Travelers policies: (1) the premium; (2) the amount and Limits of Liability; and (3) "except as otherwise provided herein."

¶ 38. No argument is made about the first two areas of difference. The parties focus on the third area of difference, "except as otherwise provided herein."

B. "Except as Otherwise Provided Herein"

¶ 39. London Market asserts that its policy does "otherwise provide" that there is no duty to defend. It contends that by omitting a promise to defend from the insuring agreement, it "otherwise provided" that there would be no duty to defend.

¶ 40. This argument is circular. As discussed above, the insuring agreement that London Market relies upon refers the insured to the follow form provision and to the terms of the underlying Travelers policies. Although London Market's insuring agreement does not promise a defense, the follow form provision incorporates the terms, definitions, exclusions, and conditions of the Travelers policies. One of those terms is Travelers' duty to defend, a duty that the London Market policy does not disclaim.

¶ 41. The phrase "except as otherwise provided herein" suggests that to "otherwise provide," there must

be a provision. London Market can point to nothing except the void in its own agreement—an agreement which by its own terms is incomplete and incorporates those provisions in the Travelers policies that are not excepted. Due to the nature of the follow form provision, London Market cannot rely on the absence of a provision as "otherwise providing" that there would be no duty to defend.

¶ 42. Given that Travelers imposes a duty to defend and London Market's silence regarding that duty, a reasonable person in the position of the insured would interpret London Market's policy as incorporating the duty to defend found in the Travelers policies. Although it is not certain whether London Market intended to provide a duty to defend when it drafted the policy, we do not construe insurance policies based on what we believe the intentions of the insurer may have been. *Frost,* 257 Wis. 2d 80, ¶ 20. Accordingly, we refuse to rewrite insurance contracts by filling in gaps left in the draftsmanship.[9] Rather, we look to the policy language itself, as it would be understood by a reasonable insured.

¶ 43. Even if we were to determine that it was unclear whether the follow form's duty to defend was incorporated into the London Market policy, given London Market's silence regarding defense, we would con-

_____

[9] An insurance company that uses a follow form policy must be cautious because it may inadvertently bind itself to unintended obligations. We have previously stated, "too often the insurance companies come to the courts asking that the courts supply the lacunae in their contract. Certainly, when the dispute concerns legal rights and obligations as between insurance companies, it is not too much to ask that they make specific provisions, either in their contracts or by treaties of understanding between themselves." *Loy v. Bunderson,* 107 Wis. 2d 400, 431, 320 N.W.2d 175 (1982).

clude that the policy language should be construed to incorporate the duty to defend. It is axiomatic that policy language which is unclear and susceptible to more than one reasonable interpretation is ambiguous and is construed in favor of coverage. *Plastics Eng'g Co.,* 315 Wis. 2d 556, ¶ 27. In interpreting the policy language, we conclude that London Market had a duty to defend.

¶ 44. Our interpretation is supported by case law. In another case addressing an excess insurer's contractual duty to defend, the Second Circuit Court of Appeals examined an excess policy containing a follow form provision. *See Home Ins. Co. v. Am. Home Prods. Corp.,* 902 F.2d 1111 (2d Cir. 1990). Similar to London Market's policy, the policy in *Home* stated that it was "subject to the same warranties, terms and conditions [as the underlying policy] (except as otherwise provided herein)[.]"

¶ 45. In that case, the underlying policy covered payments for defense costs. However, Home's policy expressly excluded "all expenses and Costs" and further defined costs to include "legal expenses." *Id.* at 1113. Given Home's express exclusion of defense costs, the Second Circuit stated that the underlying policy "conflict[ed] with the subject Home policy which . . . excludes from payment those expenses and costs" covered by the underlying policy.[10] *Id.* at 1114.

---

[10] *See also American Motorists Ins. Co. v. Trane Co.,* 544 F. Supp. 669, 698–99 (W.D. Wis. 1982) (holding that under Wisconsin law, a follow form provision in St. Paul Fire and Marine Insurance Company's policy did not incorporate the primary's duty to defend because the very next provision stated that St. Paul "at its own option, may, but is not required to, participate in the . . . defense of any claim").

¶ 46. Here, unlike in *Home,* there is no conflict between the Travelers policies and the London Market policy with respect to the duty to defend. As discussed above, the Travelers policies provide a duty to defend, and there is nothing in the London Market policy that "otherwise provides" that there will be no defense.

### IV. Parties' Arguments Extrinsic to the Policy Language

¶ 47. Having examined the language of the relevant policies and determined that London Market has a contractual duty to defend, we turn to address two additional arguments advanced by the parties in support of their respective positions regarding whether London Market's policy incorporates Travelers' duty to defend. Both arguments rely on evidence that is extrinsic to the language of the policy. We address each argument in turn.

### A. Subsequent Policies Expressly Exclude Any Duty to Defend

¶ 48. Johnson Controls asserts that evidence that London Market's 1973–1976 policy contains a duty to defend is found by the fact that four subsequent and otherwise identical policies issued by London Market expressly excluded any duty to defend. One policy stated that London Market "shall have the right but not the duty to assume . . . the defense of any suit[.]" Another policy provided that London Market "shall not be called upon to assume charge of the settlement or defense of any claim[.]"

¶ 49. We do not find Johnson Controls' reliance on the subsequent policies to be helpful for two reasons. First, we do not believe that London Market's subsequent modification of its standard insuring agreement sheds light on the language of the 1973–1976 agree

197

ment. The question is what the language of the 1973–1976 contract does provide, not what the language could provide or what is provided for in a contract executed by the parties years later.

¶ 50. Second, even if subsequent policies were relevant in determining what the language of the 1973–1976 policy provides, it is unclear what conclusion we would reach. We could conclude, as Johnson Controls suggests, that the express disclaimer demonstrates that London Market knew how to disclaim the duty to defend but did not intend to do so in the 1973–1976 policy. We could also conclude, as suggested by London Market, that the fact that Johnson Controls continued to purchase excess coverage that expressly disclaimed the duty to defend indicates that Johnson Controls never expected defense from its excess insurer.

## B. Premium Charged

¶ 51. We turn next to London Market's arguments about the premium it charged for the umbrella excess policy. London Market contrasts the relatively small premium it charged with the larger premium Johnson Controls paid for the umbrella coverage provided by Travelers.[11] London Market asserts that the relatively low premium paid for its excess policy is evidence that the parties did not contract for London Market to provide a defense. It contends that this argument is borne out by *Oelhafen v. Tower Ins. Co.*, 171 Wis. 2d 532, 539, 492 N.W.2d 321 (Ct. App. 1992), which explained that "the intent of umbrella policies to serve a different

---

[11] The premium for the London Market excess policy was $20,000, in comparison to $195,000 and $273,500 for two of the three underlying umbrella policies. The record does not reflect the premium for the third underlying policy.

function from primary policies with excess clauses is reflected in the rate structure of the two types of policies."

¶ 52. London Market's argument is unpersuasive for two reasons. First, contract interpretation should be based on the language of the policy rather than a court's conjecture about extrinsic information. Second, even if we considered the relative size of the two premiums in our analysis, we would not be persuaded that the lower premium evinces an absence of the duty to defend. There are additional reasons apart from defense costs that an umbrella excess policy might be less expensive than a primary policy or an umbrella policy.

¶ 53. In *Davis v. Allied Processors, Inc.*, the court of appeals explained that insurance companies calculate premiums based upon statistics. 214 Wis. 2d 294, 300, 571 N.W.2d 692 (Ct. App. 1997). Excess policies may be less expensive because most judgments and settlements will be within the limits of the primary policy, leaving no exposure for the excess policy. *Id.* Excess coverage is normally not reached except in the case of a catastrophic loss:

> [I]t was far more likely that payment would be required for compensatory damages under the underlying policy than would be required for a compensatory loss of over [the limits of the underlying policy] through the umbrella policy. Because the risk was diminished for the umbrella policy, it could and did charge a smaller premium.

*Id.*

¶ 54. We conclude that the extrinsic evidence offered by both parties is not helpful in our determination of whether the 1973–1976 London Market policy contains a duty to defend. Rather, for the reasons men-

199

tioned above, we conclude that London Market's policy incorporates the duty to defend provided in the underlying umbrella policies issued by Travelers.

## V. When the Duty to Defend Is Triggered

¶ 55. Having determined that London Market's policy incorporates the duty to defend found in the Travelers policies, we turn to address if and when that duty was triggered under these facts. Both London Market and the excess intervenors appear to assert that as a matter of law, an excess carrier's duty to defend may not be triggered until the limits of the underlying Travelers policies have been exhausted.[12]

¶ 56. In its brief, London Market explains:

> Wisconsin law is clear. An excess insurer is just that. It is not a co-primary insurer, responsible for providing a defense from dollar one. That obligation falls solely on the primary insurer. . . . This court should reaffirm Wisconsin law, holding that an excess insurer is not required to provide a defense where the primary is required to do so.

---

[12] The unusual facts of this case complicate the exhaustion issue here. It is undisputed that the underlying policies were not exhausted during the 1980s and 1990s because Travelers, like all of the insurers, refused to indemnify Johnson Controls for its environmental response expenses. After 2003, when this court determined that these types of expenses could be covered under the insurance policies, Johnson Controls settled its breach of contract claims with several of its insurers, including Travelers.

It is unclear whether these settlements are relevant to an inquiry about whether the limits of the underlying policies were exhausted. In any event, the settlement agreements are not in the record.

London Market further asserts that the provisions of its policy are consistent with this general rule.

██

¶ 57. We agree that a primary insurer generally has the primary duty to defend a claim. "An excess insurer usually is not required to contribute to the defense of the insured so long as the primary insurer is required to defend." 2 Arnold P. Anderson, *Wisconsin Insurance Law* § 11.33 (5th ed. 2004); *see also Southeast Wis. Prof'l Baseball Park Dist.,* 304 Wis. 2d 637, ¶ 64. "True excess coverage attaches when a single insured has two policies that cover the same loss but only one policy is written with the expectation that the primary insurer will conduct all investigations, negotiations, and defense of claims until its limits are exhausted." *Id.,* § 11.17.

██

¶ 58. However, this does not establish an immutable rule of law requiring exhaustion of all primary policies before an excess insurer's duty to defend can be triggered. Rather, it depends on the language of the policies.

¶ 59. Wisconsin case law instructs that the language of the policy should be our initial focus. After focusing on the policy language, we turn to examine Wisconsin cases that have held that an excess insurer's duty to defend may be triggered prior to the exhaustion of the primary policy.

### A. Policy Language

¶ 60. As stated above, the London Market policy incorporates the provisions of the Travelers policies unless otherwise provided. The Travelers policies explain when Travelers' duties to indemnify and to defend end—upon exhaustion of Travelers' limits of liability:

[Travelers] shall not be obligated to pay any claim or judgment or to defend any suit filed after the applicable limit of the company's liability has been exhausted by payments of judgments or settlements.

¶ 61. According to the follow form provision, London Market's duty to defend would also be terminated upon the exhaustion of its limits of liability. Although the above language determines when Travelers and London Market's duties to indemnify and defend end, this language is silent regarding the question of when the duty to defend begins.

## B. Other Insurance Provision

¶ 62. However, a separate provision in the Travelers policies, the "other insurance" provision, sheds light on the inquiry. This provision explains that if another insurer denies primary liability, Travelers will respond as though the other insurance were not available.[13] It provides:

---

[13] London Market's policy also has an other insurance provision. However, it does not address how London Market will respond when the underlying insurance is not "available" because the underlying insurer denies liability and refuses to defend. It states as follows:

If other valid and collectible insurance with any other Insurer is available to [Johnson Controls] covering a loss also covered by this Policy, other than insurance that is specifically stated to be in excess of this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance.

This provision explains that London Market's policy is excess over "other valid and collectible insurance" that is "available" to Johnson Controls. There is no conflict between London Markets other insurance provision and Traveler's promise to "respond under this policy as though such other insurance were not available."

> [I]f the insurer affording other insurance to the named insured denies primary *liability* under its policy, *[Travelers] will respond under this policy as though such other insurance were not available.*

(Emphasis added.) A reasonable person in the position of the insured would interpret this provision as promising that, where the excess insurer has a contractual duty to defend, it will step in and provide a defense in the event that the primary insurer refuses to do so.[14]

¶ 63. Under the follow form provision, the language of the "other insurance" provision is incorporated into the London Market policy "unless otherwise provided herein." Thus, London Market would be required to "respond under [its] policy as though such other insurance were not available" in the event that the underlying insurer "denies primary liability under its policy"—unless the London Market policy otherwise provides.

---

[14] Travelers' other insurance provision also explains that, in the event of the primary insurer's refusal to defend and Travelers responding as though the primary policy were not available, Travelers would be subrogated to the rights of the insured against its primary insurer: "Thereafter, [Travelers] shall be subrogated to all rights of the insured to such other insurance and the insured shall do all things necessary to enforce such rights." This policy language appears to recognize that although Travelers would provide a defense, the insured might have a breach of contract or bad faith claim against its primary insurer. If so, Travelers could be subrogated to those claims.

The Travelers policies go on to explain that "[i]n the event of any payment under this policy, [Travelers] shall be subrogated to all the insured's rights of recovery therefor . . . and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights."

¶ 64. We examine next whether the London Market policy does indeed otherwise provide. Our focus is directed to the meaning of the word "liability."

## C. Interpreting the Term "Liability"

¶ 65. London Market asserts that under the limits of liability provision in its policy, its duty to defend did not "attach" until the limits of the underlying Travelers policies were exhausted. The limits of liability provision states that "liability shall attach" to London Market only after Travelers has paid or has been held liable to pay its limits:

> It is expressly agreed that liability shall attach to the Underwriters only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective net loss liability[.]

¶ 66. The limits of liability provision discusses when London Market's "liability" begins—after Travelers has paid or has been held liable to pay the full amount of its net loss liability. However, it does not expressly state when the duty to defend begins. In isolation, it is unclear whether the term "liability" encompasses the duty to defend.

¶ 67. Although the London Market policy provides that "liability" does not attach until the underlying policies have been exhausted, it does not define the term "liability." An examination of the term "liability" as it is used in the context of the London Market policy indicates, however, that "liability" refers to indemnification for injuries or property for which Johnson Controls is held liable. It does not refer to the duty to defend.

204

¶ 68. For instance, London Market's coverage section provides that it promises "to indemnify the Assured for all sums for which the Assured shall be obligated to pay by reason of the liability" for damages on account of personal injuries, property damage, or advertising liability. In this context, liability is synonymous with indemnification.

¶ 69. The term "liability" appears to be used interchangeably with "indemnification" in other places throughout London Market's policy. The "non cumulation of liability" provision equates liability with payment for personal injury or property damage:

> [I]n the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of the termination of this Policy [London Market] will continue to protect the Assured for liability in respect of such personal injury or property damage without payment of additional premium.

Further, its "notice of occurrence" provision discusses injuries and damage for which the insured will be held liable:

> Whenever the Assured has information from which they may reasonably conclude that an occurrence covered hereunder involves injuries or damage which, in the event that the Assured shall be held liable, is likely to involve this Policy, notice shall be sent . . . .

■■■

¶ 70. It therefore appears that the exhaustion provision's discussion of when "liability" attaches means that London Market will not indemnify Johnson Controls for injury or property damage until the indemnification limits of the underlying policies have been exhausted. However, defense and indemnification are separate duties. *Radke,* 217 Wis. 2d at 44. Even if

London Market's duty to indemnify does not attach until exhaustion of the underlying policies, that does not mean that its duty to defend requires exhaustion to attach.[15] An insurer can have a duty to defend even under circumstances when there will ultimately be no indemnification under the policy. *See id.*

¶ 71. London Market makes one additional argument in support of its assertion that its duty to defend was not triggered until exhaustion of the Travelers policies. It shifts from examining the language of its own policy to focusing on the language of the Travelers policies. It points to the paragraph in the Travelers policies that imposes both the duty to indemnify and the duty to defend and explains that the first word in that paragraph is "liability":

> Liability. The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . , and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury or damage[.]

¶ 72. Thus, London Market contends, the term "liability" encompasses both defense and indemnification obligations. At oral argument, counsel for London Market explained: "[I]f the term 'liability' is dependent upon what the Travelers policy says, it is clear that Travelers considers both the duty to defend and the duty to indemnify as part of liability. . . . Under that analy-

---

[15] *See Gen. Accident Ins. Co. Am. v. Safety Nat. Cas. Corp.,* 825 F. Supp. 705, 709 (E.D. Penn. 1993) (interpreting a nearly identical exhaustion provision about when "liability shall attach" and concluding that "[i]t says nothing . . . about the nature of [the excess insurer's] duty to defend.").

sis, . . . then the duty to defend and the duty to indemnify cannot attach until such time as there is exhaustion."

¶ 73. London Market's argument rests on an infirm foundation. In examining the language of the Travelers policies, it is far from "clear that Travelers considers both the duty to defend and the duty to indemnify as part of liability." The term "liability" is not set forth in the definition section of the Travelers policies. Although not specifically defined, it appears in many places throughout the policies. In most places, the term "liability" is used to refer to the obligation to indemnify, and defense is treated as a separate obligation.[16]

¶ 74. Given a lack of definition and the disparate use of the term "liability" in the Travelers policies, it is not at all clear that the Travelers policies intend that "liability" be defined to include the duty to defend. Even if it were clear, however, such usage would conflict with the usage of the term "liability" in London Market's own

---

[16] For instance, the supplemental payments section treats costs for indemnification separately from defense costs. It provides that the company will pay, "in addition to the applicable limit of liability . . . all expenses incurred by the company, and all costs taxed against the insured in any suit defended by the company." Further, Travelers' limits of liability section discusses costs incurred for bodily injury and property damage—not those costs incurred in defending: "The limits of liability . . . is the combined total limit of the company's liability for all damages, including damages for care and loss of services, because of bodily injury and property damage . . . ."

We recognize that Travelers' Limits of Liability section is supplanted by London Market's Limits of Liability section under the express terms of the follow form provision. We discuss it here only as an example of how the term "liability" is used throughout the policies.

policy. There, the term "liability" is consistently used to mean indemnification. As we previously explained, if there is a conflict between the London Market policy and the Travelers policies, the terms of the London Market policy control. *See supra*, ¶¶ 44–46 & n.10.

¶ 75. We conclude that although London Market's duty to indemnify is conditioned upon exhaustion of the underlying Travelers policies, its duty to defend is not so conditioned. Rather, under the "other insurance" provision, London Market was required to "respond under [its] policy as though such other insurance were not available" because Travelers "denie[d] primary liability under its policy." Thus, London Market was required to assume the defense.

### D. Supportive Case Law

¶ 76. Contrary to the assertion of London Market, this conclusion does not fly in the face of an overarching rule of law requiring exhaustion of all primary policies before the duty to defend can be triggered. Quite the contrary. Wisconsin case law recognizes that an excess insurer's duty to defend may under certain circumstances be triggered prior to the exhaustion of the primary policy.

¶ 77. In *Teigen v. Jelco Wis., Inc.*, 124 Wis. 2d 1, 367 N.W.2d 806 (1985), for example, this court approved a settlement agreement between a primary insurer and the plaintiff who brought suit against the insured. The settlement agreement was for less than the limits of the primary policy. It released all claims against the primary and the insured, but it left the excess carrier potentially

208

liable.[17] Although the excess insurer argued that the primary wrongfully attempted to avoid its responsibility to defend the suit until it fully paid its policy limits, the court rejected that argument. *Id.* at 9–10. Thus, it concluded that the excess carrier was required to defend the suit, regardless of the fact that the underlying primary policy had not been fully exhausted.

¶ 78. *Teigen* is not alone. In *American Motorists Insurance Co. v. Trane Co.*, 544 F. Supp. 669, 692 (W.D. Wis. 1982), American Motorists' excess policy promised to defend against suits for losses covered by the American Motorists policy but not covered by the underlying policy. *Id.* at 692. The federal district court applied Wisconsin law to the policy and concluded that the excess insurer with a contractual duty to defend was required to do so in the event that the primary insurer refused to defend:[18]

> If the underlying insurer has refused to defend, asserting that there is no coverage under the substantive provisions of the underlying policy, the excess insurer will have a duty to defend, provided there is coverage under the excess policy and the claim falls within the policy limits of the excess insurer.

---

[17] Importantly, the settlement agreement provided the excess carrier would not be responsible for paying any damages below the primary's limits of liability, $500,000. Thus, the excess insurer could only be held liable for damages exceeding $500,000, and could not be held liable for the difference between the primary's $500,000 limit of liability and the amount of settlement, $390,000.

[18] There, the insured tendered the defense to all four layers of insurers. The complaint alleged facts sufficient to impose on the primary insurer a duty to defend. *Am. Motorists Ins. Co.,* 544 F. Supp. at 685. Nevertheless the primary insurer denied coverage and refused to defend against the lawsuit.

*Id.* Additionally, the court concluded that a complaint which alleges damages in excess of the limits of the underlying policy triggers an excess insurer's duty to defend, even if the underlying insurer undertakes the defense as well. *Id.*

¶ 79. Eleven years later, the Wisconsin court of appeals revisited the holdings of *American Motorists.* In *Azco Hennes Sanco, Ltd. v. Wisconsin Insurance Security Fund,* 177 Wis. 2d 563, 502 N.W.2d 887 (Ct. App. 1993), a suit was filed against the insured, Azco, seeking damages in excess of the limits on Azco's primary insurance policy. Azco's primary insurer defended against the lawsuit. Additionally, Azco also hired a second attorney who was instrumental in ensuring that the case settled within the primary policy limits. Azco then sent the bills for the second attorney to its excess insurer, asserting that it was required to pay them under *American Motorists.*[19] The excess insurer refused, asserting that its duty to defend had not been triggered even though the complaint against Azco alleged damages in excess of the primary policy's limits.

¶ 80. The court of appeals noted that it was not bound to follow a federal district court's opinion on Wisconsin law. *Id.* at 568. It rejected the conclusion in *American Motorists* that alleged damages in excess of the primary policy's limits were sufficient to trigger an excess insurer's duty to defend. *Id.*

¶ 81. However, it did not disturb the other conclusion in *American Motorists*—that an excess insurer with a contractual duty to defend might be obligated to

[19] The excess policy stated that it would defend the insured against any suit regarding "occurrences covered under this policy, but not covered under the underlying insurance." *Azco Hennes-Sanco, Ltd. v. Wisconsin Ins. Sec. Fund,* 177 Wis. 2d 563, 566, 502 N.W.2d 887 (Ct. App. 1993).

assume the defense if the primary insurer refused to do so. The *Azco* court stated that the *American Motorists* case "is distinguishable on its facts. In *American Motorists* the primary insurer refused to defend, whereas in this case Azco's primary insurer undertook its defense in the action." *Id.*

¶ 82. *American Motorists* was also cited in a recent decision of the Wisconsin court of appeals, *Southeast Wisconsin Professional Baseball Park District v. Mitzubishi Heavy Industries America,* 2007 WI App 185, 304 Wis. 2d 637, 738 N.W.2d 87. In that case, the primary insurer refused to defend despite the circuit court ordering it to defend on three separate occasions. *Id.*, ¶ 13. As a result, an excess carrier provided a defense. *Id.*, ¶ 8.

¶ 83. In a footnote, the court of appeals cited *American Motorists* and explained: "If the underlying insurer has refused to defend, asserting that there is no coverage under the substantive provisions of the underlying policy, the excess insurer will have a duty to defend, provided there is coverage under the excess policy and the claim falls within the policy limits of the excess insurer." *Id.*, ¶ 8, n.4. Given that the primary had breached its primary duty to defend, however, the court required it to reimburse the excess insurer for the defense costs it incurred. *Id.*, ¶¶ 61–64.

¶ 84. The United States Court of Appeals for the Tenth Circuit also relied on *American Motorists* when it addressed a situation strikingly similar to the facts of this case. *See Hocker v. New Hampshire Ins. Co.,* 922 F.2d 1476 (10th Cir. 1991). There, an umbrella insurer asserted that its duty to defend was never triggered because the primary policy limits had not been exhausted. *Id.* at 1481. The court rejected the argument, concluding that the language of the umbrella policy

211

promised to defend suits "not covered, as warranted" and established that the umbrella insurer must drop down and defend upon the primary insurers' wrongful refusal to do so. *Id.* at 1482.

¶ 85. The court explained that "as written," the umbrella policy "explicitly addresses the possibility that the primary insurer will wrongfully deny coverage for occurrences that it had warranted would be covered by its primary policy." *Id.* In those circumstances, "[t]he excess carrier must then drop down and provide a defense." *Id.* The court further clarified that had the umbrella insurer fulfilled this obligation, it would be able to maintain a subrogation claim against the primary insurer to recoup the legal expenses incurred. *Id.* at 1483, n.6.

¶ 86. Some courts appear to have recognized a general rule that an insured that has purchased layers of coverage—including layers of a contractual duty to defend—should not be left without a "prompt and proper defense[.]" *New Hampshire Indem. Co., Inc. v. Budget Rent-a-Car Systems, Inc.,* 64 P.3d 1239 (Wash. 2003). For example, the Washington Supreme Court stated: "[I]f a primary insurer fails to assume the defense, for any reason, the secondary insurer which has a duty to defend should provide the defense[.]" *Id.* at 1243; *see also* Anderson, *supra,* §§ 11.26, 11.33; *Grossman v. Am. Family Mut. Ins. Co.,* 461 N.W.2d 489 (Minn. App., 1990). We need not and do not adopt a general rule to resolve this case, however, given that the language of the policies provides that London Market was required to assume the defense.[20]

---

[20] The dissent miscasts and inflates the scope of our analysis. The fundamental error of the dissent is its failure to recognize that our analysis is driven by policy language—not

## VI

¶ 87. In sum, based on the language of the policies, we conclude that London Market had a duty to defend. Although its excess umbrella policy does not have a duty to defend provision, it does contain a follow form provision that incorporates the duty to defend found in the underlying Travelers policies.

¶ 88. We further determine that its duty to defend was not conditioned upon exhaustion of the underlying Travelers policies. Rather, under the terms of the "other insurance" provision, London Market's duty to defend was triggered when the underlying insurer "denie[d] primary liability under its policy." Accordingly, we affirm the circuit court and remand for further proceedings.

*By the Court.*—The order of the circuit court is affirmed, and the cause is remanded.

---

generalizable concepts about the role of excess insurance and the duties of excess insurers. Focusing on concepts rather than policy language, the dissent makes a series of predictions about the effect that this opinion will have on all excess insurance policies, regardless of policy language.

As a result of this error, the dissent speaks in broad terms. For example, the dissent forecasts that "after today, the excess insurer becomes a surety for the performance of the underlying umbrella and the primary insurer's obligations[.]" *Dissent,* ¶ 104. "Even if an insurance policy . . . fails to mention even one word about defending, the majority opinion imposes an unqualified obligation to defend." *Id.,* ¶ 103. "[T]he majority creates an obligation for the excess insurer to defend as soon as a primary insurer fails to follow through with its obligation to defend." *Id.,* ¶ 89.

Our decision will have no such transformative effect on Wisconsin law because our analysis is driven by the specific policy language at issue in this case. A different result is contingent upon different policy language.

¶ 89. ANNETTE KINGSLAND ZIEGLER, J. (*dissenting*). I dissent because the majority opinion creates a duty to defend for London Market that is not found in the contract of insurance. In so doing, the majority undermines the plain language of the London Market policy, which promises only indemnification. The majority conveniently picks and chooses terms from another company's separate, underlying policy in order to craft a duty to defend. Moreover, even if one were to assume, arguendo, that the London Market policy did incorporate a duty to defend from an underlying policy, such a duty could not arise until all primary policies were exhausted. This is so because the London Market policy is an excess policy wherein London Market's obligation is conditioned upon the exhaustion of all underlying policies. By ignoring the clear language of the excess policy, the majority creates an obligation for the excess insurer to defend as soon as a primary insurer fails to follow through with its obligation to defend. Because the majority opinion transforms the excess insurer into a primary insurer by imposing a duty to defend on the excess insurer, in contravention of the terms of the London Market insurance policy, I must respectfully dissent.

### A. The majority decision is contrary to longstanding principles of insurance law

¶ 90. True excess coverage "exists as a part of layered coverage created by specific design and is intended to come into play only when the limits of underlying primary coverage are exhausted." 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 200:39 (3d ed. 2007). As a general rule, an excess insurer is not required to defend until the primary insurer's policy limits are exhausted, even when the claim exceeds the primary insurer's policy limits or when the primary

214

insurer refuses to defend. *Id.*, §§ 200:41–43. While insurers and insureds are free to contract around these general rules, here, the parties did not do so.

¶ 91. The majority weaves together separate and distinct policies from different insurers to reach a particular outcome. In the same breath, the majority also concludes that the London Market policy's language is ambiguous. Essentially, the majority concludes that the policy is ambiguous because it does not specifically pen every conceivable limitation or exclusion. In so doing, the majority effectively imposes a requirement that insurance policies list all possible limitations and exclusions regardless of relevance to avoid ambiguity. The majority for the first time concludes that silence on an issue creates ambiguity and, thus, a duty.

¶ 92. The duty to defend is separate from the duty to indemnify. Neither common law nor statute mandates that an insurer always defend its insured. *Novak v. Am. Family Mut. Ins. Co.*, 183 Wis. 2d 133, 137, 515 N.W.2d 504 (Ct. App. 1994); 14 Russ & Segalla, *supra,* § 200:5 ("An insurer does not have a duty to defend if there is no contractual obligation to defend."). The majority decision upsets these longstanding principles and creates new contractual obligations that have never before been required or recognized.

### B. The London Market policy does not provide a duty to defend

¶ 93. The London Market policy is a policy of indemnification and does not provide a duty to defend its insured, Johnson Controls. Absent an express promise to defend, no reasonable insured would expect an excess insurance policy to provide a duty to defend, especially in light of the general rule that excess policies

do not include a duty to defend. To the contrary, with respect to primary insurance policies, the standard industry practice is to provide a defense along with indemnification. *Compare Gross v. Lloyd's of London Ins. Co.,* 121 Wis. 2d 78, 84, 358 N.W.2d 266 (1984) (noting that primary insurance policies "impose two duties on the insurer with respect to the insured—the duty to indemnify and the duty to defend") *with* 2 Arnold P. Anderson, *Wisconsin Insurance Law* §§ 11.16–.18 (5th ed. 2004) (noting that specific excess insurance and true excess insurance generally do not contain a duty to defend). Here, consistent with industry practice, London Market's policy is an excess policy that does not provide a duty to defend.

¶ 94. The majority cannot find a duty to defend within the terms of the London Market policy itself; therefore, it resorts to importing that duty from the Travelers policy by way of the London Market policy's "follow form" provision. In so doing, the majority rewrites the insurance policy in order to impose on London Market a duty for which it did not contract, that neither it nor its insured contemplated, and for which it was not paid.

¶ 95. The majority determines that the duty to defend was triggered, not upon the exhaustion of the underlying policies, but rather, upon the underlying insurer's denial of primary liability. Majority op., ¶¶ 4–5. The majority nonetheless acknowledges that "it is not certain whether London Market intended to provide a duty to defend when it drafted the policy" but nevertheless concludes that the proper, and only, inquiry is not what the policy says, but rather, how the policy language could be understood by the insured. Majority op., ¶ 42. Because "[a]n insurance policy is construed to give effect to the intent of the parties as

216

expressed in the language of the policy," *Folkman v. Quamme,* 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857, I turn to the policy language at issue.

¶ 96. The pertinent parts of the London Market policy's insuring agreement are as follows:

## INSURING AGREEMENTS

### 1. COVERAGE

[London Market] hereby agree[s], *subject to the limitations, terms and conditions* hereinafter mentioned, *to indemnify* [Johnson Controls] for all sums, which [Johnson Controls] shall be obligated to pay . . . .

. . . .

## CONDITIONS

. . . .

### 2. MAINTENANCE OF UNDERLYING UM-BRELLA INSURANCE

This policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and Limits of Liability and except as otherwise provided herein) as are contained in [the underlying Travelers policy] . . . .

(Emphasis added.) The part of Travelers policy that the majority incorporates into London Market's policy in order to create a duty to defend, reads as follows:

Liability. The company . . . shall have the right and *duty to defend* any suit against [Johnson Controls] seeking damages on account of [a covered incident]. . . .

(Emphasis added.) The majority must cut and paste that duty from the Travelers policy to the London Market policy in order to find a duty to defend.

217

¶ 97. The plain language of the London Market policy, however, shows that no duty to defend is incorporated because the duty to defend does not in any way modify or affect the duty to indemnify.[1] Simply stated, the London Market policy: (1) promises to indemnify its insured; (2) subjects that promise of indemnification to various conditions; and (3) points to the Travelers policy for additional "terms, definitions, exclusions and conditions" to which the *duty to indemnify* is subject. The follow form provision, however, does not incorporate the entire Travelers policy by reference.

¶ 98. The majority opinion employs the London Market policy's follow form provision to incorporate the Travelers policy's obligation to defend. Instead of determining that the follow form addressed the level of underlying coverage and the type of claims that were covered so that the London Market policy remained truly an excess umbrella policy, the majority creates a duty to defend. In so doing, the majority operates contrary to the language of the insurance contract and the general rule for excess liability policies. 2 Anderson, *supra,* § 11.16.

---

[1] London Market undertook "to indemnify [Johnson Controls] for all sums which [Johnson Controls] shall be obligated to pay by reason of liability [] imposed upon [Johnson Controls] by law . . . for damages on account of: (i) Personal Injuries[;] (ii) Property Damage[;] (iii) Advertising Liability caused by or arising out of each occurrence . . . ." London Market's own insuring language set forth the extent of its obligations on the policy and while it agreed to follow the terms of the underlying policies it did so "except as otherwise provided herein." By the majority imposing a duty to defend on London Market, it fails to give effect to the contractual provisions of the policy. Here, the excess policy terms explicitly preclude liability until after the underlying insurers "have paid or have been held liable to pay the full amount of their [limits]."

¶ 99. Instead of acknowledging this plain reading of London Market's insurance policy, the majority sidesteps this point and incorporates a portion of the Travelers policy's "other insurance" clause into the London Market policy. The majority claims that under this clause "London Market would be required to 'respond under [its] policy as though such other insurance were not available' in the event that the underlying insurer 'denies primary liability under its policy'— unless the London Market policy otherwise provides." Majority op., ¶ 63.

¶ 100. In order to accomplish this additional rewriting of the contract, the majority ignores the "other insurance" clause already present in the London Market policy. The London Market policy's "other insurance" clause explicitly limits the policy to excess coverage, which is antithetical to dropping down to provide a primary defense. *See infra* Part C. Therefore, the London Market policy does provide terms other than the "other insurance" clause in the Travelers policy. As such, the Travelers policy's "other insurance" clause cannot be incorporated into London Market's policy, even under the majority's logic.[2]

¶ 101. Particularly troublesome here is that the plaintiff seeks to recover defense costs for an action commenced 25 years ago. Notwithstanding this, the majority has chosen to transform an excess insurance policy into a primary insurance policy. Under the majority's logic, when a primary insurer fails to defend,

---

[2] The majority designs its definition of liability by concluding that liability is not otherwise provided in the London Market policy. As a result, once again, the majority picks and chooses which terms in which policy meet the outcome that it desires.

even if this occurs as soon as a lawsuit is commenced, an excess insurer must provide a defense to the insured.

¶ 102. The majority also concludes that any consideration of the cost of the premiums is "not helpful" in reaching its conclusion and states that "contract interpretation should be based on the language of the policy rather than a court's conjecture about extrinsic information." Majority op., ¶¶ 54, 52. In this case, the relatively low cost of the premiums could at least inform some part of the analysis as to the expectations of the parties in obtaining excess coverage, especially in light of the fact that the duty to defend does not appear anywhere in the London Market policy.[3] *See* 2 Anderson, *supra,* § 11.16 ("An insurer typically charges a lower premium for specific or following-form excess insurance based on the decreased risk of a judgment or settlement within higher layers of coverage, *as well as the absence of a duty to defend the insured.*") (emphasis added).

¶ 103. In the end, the consumers of excess insurance policies will be the ones who pay for the majority's decision. No longer will an excess insurance carrier be able to charge only $20,000 for a $10 million policy of indemnity coverage as an excess policy. Under the holding of the majority opinion, a duty to defend can begin at the inception of the lawsuit because its holding

[3] With respect to the underlying policy, Travelers was paid yearly premiums of $195,000 and $273,500 to provide $7 million of umbrella coverage, including both indemnification and defense. In comparison, London Market was paid a yearly premium of $20,000 to provide $10 million of coverage excess to the Travelers policy for indemnification. The majority would have you believe that the $20,000 premium compensates London Market for not only the $10 million of indemnification, but also for providing a legal defense against all claims from day one.

causes the excess insurer to become the primary insurer whenever the primary insurer does not perform. Even if an insurance policy, such as the London Market policy here, fails to mention even one word about defending, the majority opinion imposes an unqualified obligation to defend. It matters not, according to the majority, that the London Market insurance policy specifically requires that the underlying insurance remain in full force and effect before any liability may arise for London Market.

¶ 104. Thus, after today, the excess insurer becomes a surety for the performance of the underlying umbrella and the primary insurer's obligations, even if the primary insurer has breached its duty to defend.

### C. Even assuming, arguendo, that a duty to defend exists, the policy first requires exhaustion of the primary policy

¶ 105. Even if one were to conclude that the London Market policy incorporates a duty to defend from the Travelers policy, I must dissent because the London Market policy is an excess policy to the Travelers policy and is conditioned upon exhaustion of the Travelers policy. As previously stated, an " 'excess insurer is not obligated to defend until the primary [policy] limits are exhausted.' " *Azco Hennes-Sanco, Ltd. v. Wis. Ins. Sec. Fund,* 177 Wis. 2d 563, 568, 502 N.W.2d 887 (Ct. App. 1993)(citation omitted).[4] London

---

[4] *See also* 2 Arnold P. Anderson, *Wisconsin Insurance Law* § 11.14 (5th ed. 2004) ("*Excess* or *secondary insurance* coverage attaches only after a predetermined amount of primary coverage is exhausted."); 1 Allen D. Windt, *Insurance Claims & Disputes* § 4.11 (5th ed. 2007) ("Most courts have held that an excess insurer that has a duty to defend is not obligated to

Market's policy makes clear, in at least two places that any duty it has to Johnson Controls is conditioned upon the exhaustion of the Travelers policy.[5]

¶ 106. The London Market policy clearly defines itself as an excess policy. The pertinent language at "Conditions" reads as follows:

### 5. **OTHER INSURANCE**

If other valid and collectible insurance with any other Insurer is available to [Johnson Controls] covering a loss also covered by this Policy, other than insurance that is specifically stated to be in excess of this Policy, the insurance afforded by this Policy *shall be in excess of and shall not contribute with such other insurance.*

(Emphasis added.) This clause solidifies London Market's place in the hierarchy of insurance policies— below all policies that specifically state they are in excess to London Market's policy and above all other policies.

---

provide a defense if the primary insurer is so obligated."); 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 200:43 (3d ed. 2007) ("As a general rule, a true excess insurer's duty to defend is not automatically triggered when the primary insurer denies coverage.").

[5] The Travelers policy is not the only policy that underlies the London Market policy. However, the Travelers policy did *not* condition either its duty to defend or its duty to indemnify on the exhaustion of policies that underlie the Travelers policy, as the London Market policy did. Instead, the Travelers policy provided that Travelers would "defend any suit against the insured seeking damages on account of [a covered] injury" and would share indemnification costs with the underlying insurance policies on one of two pro rata bases, depending on the language in the other insurance contract. For simplicity's sake, this dissent treats the Travelers policy as if it were primary.

¶ 107. Furthermore, the London Market policy at "Excess Umbrella Liability" expressly conditions its performance on exhaustion of the Travelers policy limits:

### 2. LIMIT OF LIABILITY-UNDERLYING LIMITS

It is expressly agreed that liability shall attach to [London Market] only after [Travelers] ha[s] paid or ha[s] been held liable to pay the full amount of [its] respective ultimate net loss liability . . . .

"[U]ltimate net loss" is the $7 million underlying limits in the Travelers policy.

¶ 108. While it is true that the policy issued by London Market is a follow form insurance policy, its duties arise only after liability reaches a certain "excess" monetary level. *See Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London,* 871 N.E.2d 418, 426 (Mass. 2007) ("Follow form language thus allows an insured to have coverage for the same set of potential losses (and with the same set of exceptions) in each layer of the insurance program. The language does not, however, bind the various insurers to a form of joint liability should coverage at a prior layer fail. The layer of risk each insurer covers is defined and distinct."); *see also* 2 Anderson, *supra,* § 11.18 (" 'An excess policy covering the same risks that are covered by the underlying policy is known as a "following form" policy.' ") (quoting *Coleman Co., Inc. v. Cal. Union Ins. Co.,* 960 F.2d 1529, 1530 n.1 (10th Cir. 1992)).

¶ 109. The majority's interpretation of London Market's "limits of liability" (or exhaustion) provision is somewhat confusing. Majority op., ¶¶ 65–75. The majority concedes that the limits of liability provision provides that " 'liability' does not attach until the underlying policies have been exhausted." *Id.,* ¶ 67. How-

ever, the majority concludes that this provision is limited to the duty to indemnify and not the duty to defend. The majority inconsistently concludes that when it comes to indemnification, "liability" does not attach until the underlying policy is exhausted, but that "liability" attaches before exhaustion when it comes to the duty to defend. Its rationale is inconsistent and cannot be reconciled.

¶ 110. Specifically, the London Market excess umbrella policy states: "[L]iabilities shall attach to [London Market] only after the Underlying Umbrella Insurers have paid or have been held liable to pay" their policy limits. Thus, despite the majority's creativity, any assumed duty to defend under the excess umbrella policy cannot arise when the coverage under the excess umbrella policy is yet to be invoked.

¶ 111. Simply stated, the majority wishes to have its cake and eat it too. On the one hand, the majority concludes that the London Market policy does not define the term "liability" and so it imports Travelers policy's definition in its rewriting of the contract to create that duty to defend. Thus, even if liability includes the duty to defend, as the majority would redefine it, such duty can reasonably attach only after Travelers has paid or been liable to pay the full amount of its ultimate net loss liability, that is, $7 million. This disparity magnifies the majority's overreaching when it comes to creating the duty to defend, because in point of fact, even if it can be said that there is a duty to defend, that duty can attach only after Travelers has exhausted its policy limits.

¶ 112. The majority's reasoning errs in its conclusion that once Travelers refuses to defend Johnson Controls, London Market is required to drop down to fill Travelers' shoes and provide a defense. It requires that London Market's duty to defend is in full force and

effect. At the same time, Travelers' duty to defend is triggered, that is, from the day Johnson Controls tendered the defense to its insurers. If the majority indeed believes that Travelers' duty to defend was fully incorporated into London Market's policy and is not subject to the exhaustion requirement, the logical conclusion is that London Market's duty to defend is triggered on day one and converts an excess insurer into a primary insurer when it comes to the duty to defend. This conclusion misreads both the insurance policy's provisions and misstates Wisconsin law.

¶ 113. London Market's policy contains no promise to drop down in the event of denial of defense by Travelers. As just noted, London Market's policy attaches, at most, only after the Travelers policy is exhausted.

¶ 114. The majority states that there is no absolute rule of law that an excess insurer's duty to defend is never triggered until the underlying policy limits are exhausted. Of course this is true, since insurers and insureds can contract so that an excess insurer's duty to defend is triggered prior to the exhaustion of the underlying policy limits. However, the parties did not so contract here. Moreover, the majority opinion lacks any Wisconsin case in which a court required an excess insurer to provide a defense before the underlying policy limits were exhausted.

¶ 115. For example, the majority reads *Teigen v. Jelco of Wisconsin, Inc.,* 124 Wis. 2d 1, 367 N.W.2d 806 (1985), as requiring a defense by the excess insurer before exhaustion of primary insurance. This reading of *Teigen* is far from complete. In *Teigen,* the insured plaintiff had executed a *Loy*[6] release, in which the

---

[6] *Loy v. Bunderson,* 107 Wis. 2d 400, 320 N.W.2d 175 (1982).

plaintiff accepted a settlement sum less than the defendant's primary insurer's policy limits, but in exchange released the defendant and his primary insurer for the full amount of the policy limits and for any amount above the limits of the excess insurer, specifically reserving a cause of action against the excess insurer. *Id.* The court held that the excess insurer had a duty to defend after the release was executed. *Id.* at 11–12.

¶ 116. While the plaintiff in *Teigen* was not paid the primary insurer's full policy limits, those limits were exhausted because the insured received the full protection of the primary policy for which he had bargained. *Id.* at 8 ("The trial court correctly concluded that [the primary insurer] *has exhausted its liability* by virtue of the *Loy* release. The effect of the settlement is that [the primary insurer] has discharged *in toto* its obligation to its insured.")(emphasis added).

¶ 117. *Loy* and *Teigen* highlight, rather than abrogate, the necessity of exhausting a primary insurer's policy limits before an excess insurer can be required to provide a defense. Absent a *Loy* release that exhausts a primary insurer's limits, a settlement below those limits does not trigger an excess insurer's duty to defend if the insurer had contracted to defend. *See Azco,* 177 Wis. 2d at 567 (holding that an excess insurer had no duty to defend a claim that settled within the primary insurer's limits, even where the original claim brought exceeded the primary insurer's limits).

¶ 118. The majority also cites *American Motorists Insurance Co. v. Trane Co.,* 544 F. Supp. 669, 692 (W.D. Wis. 1982), for the proposition that "[i]f the underlying insurer has refused to defend . . . , the excess insurer will have a duty to defend . . . ." However, this reasoning was explicitly rejected in *Azco,* 177 Wis. 2d at 568

("*Azco* . . . argues that we should nonetheless follow the district court's reasoning. We decline to do so . . . .").

¶ 119. The *Azco* court went further than rejecting *Trane;* it endorsed and adopted the view of a majority of jurisdictions, which hold that an excess insurer has no obligation to defend its insured until the primary insurer's limits are exhausted, absent express policy language otherwise. *Id.* at 568 (citing *Firemen's Fund Ins. Co. v. Rairigh,* 475 A.2d 509, 518 (Md. Ct. Spec. App. 1984) *cert. denied,* 482 A.2d 501 (1984)).[7]

¶ 120. Finally, the majority relies on a footnote in *Southeast Wisconsin Professional Baseball Park District v. Mitsubishi Heavy Industries America, Inc.,* 2007 WI App 185, ¶ 8 n.4, 304 Wis. 2d 637, 738 N.W.2d 87, which says that an excess insurer must drop down and

---

[7] The *Azco* court went on to cite numerous other sources demonstrating the majority rule. *Azco Hennes-Sanco, Ltd. v. Wis. Ins. Sec. Fund,* 177 Wis. 2d 563, 569, 571–72 & nn.3–4, 502 N.W.2d 887 (Ct. App. 1993) (citing *Signal Cos. v. Harbor Ins. Co.,* 612 P.2d 889 (Cal. 1980); *Southgate State Bank & Trust Co. v. United Pac. Ins. Co.,* 588 P.2d 486 (Kan. Ct. App. 1979); James M. Fredericks, Comments, *Excess Insurer's Duty to Defend After Primary Insurer Settles Within Policy Limits: Wisconsin After Loy and Teigen,* 70 Marq. L. Rev. 285, 294–95 (1987); *American Concept Ins. Co. v. Certain Underwriters at Lloyds of London,* 467 N.W.2d 480 (S.D. 1991); *Am. Sur. Co. v. State Farm Mut. Auto. Ins. Co.,* 142 N.W.2d 304 (Minn. 1966); *Hartford Accident & Indem. Co. v. Cont'l Nat'l Am. Ins. Cos.,* 861 F.2d 1184 (9th Cir. 1988); *P.L. Kanter Agency, Inc. v. Cont'l Cas. Co.,* 541 F.2d 519 (6th Cir. 1976); *West Am. Ins. Co. v. Allstate Ins. Co.,* 295 F.2d 513 (10th Cir. 1961); *Colo. Farm Bureau Mut. Ins. Co. v. N. Am. Reinsurance Corp.,* 802 P.2d 1196 (Colo. Ct. App. 1990); *Occidental Fire & Cas. Co. v. Underwriters at Lloyd's, London,* 311 N.E.2d 330 (Ill. App. Ct. 1974); *Mission Nat'l Ins. Co. v. Duke Transp. Co., Inc.,* 792 F.2d 550 (5th Cir. 1986); *Radar v. Duke Transp. Inc.,* 492 So.2d 532 (La. Ct. App. 1986)).

defend when a primary insurer fails to do so. Reliance on this footnote is likewise misplaced. First, the question of whether an excess insurer was *required* to defend was not before the court. Second, the footnote cites to the opinion of the federal district court in *Trane* and ignored *Azco*'s rejection of that opinion.[8] Also, in *Trane,* unlike the case now before this court, the excess insurer elected to defend and later sought reimbursement from the primary insurer.

## CONCLUSION

¶ 121. An insurance policy is a contract. There is no common law or statutory duty to defend. There is a duty to operate in good faith; a violation of that duty is a tort, not a breach of contract.[9] Here, London Market's excess policy does not provide a duty to defend. Furthermore, even if one were to assume, arguendo, that there is a duty to defend, it cannot be invoked until the primary policy is exhausted because of the London Market policy language.

¶ 122. In sum, the majority's conclusion increases the likelihood of nonperformance by primary insurers or underlying insurers as it shifts costs to excess insurance providers.

---

[8] The court of appeals is not permitted to overrule its own holdings, which the footnote in *Southeast* tacitly does. *See Cook v. Cook,* 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997) ("[O]nly the supreme court, the highest court in the state, has the power to overrule, modify or withdraw language from a published opinion of the court of appeals."). Thus, footnote 4 from *Southeast* has no precedential value.

[9] Under the majority's logic, what happens to a bad faith claim now? Does the excess carrier become the injured party with respect to that cause of action?

¶ 123. London Market issued an excess liability policy that did not include a contractual undertaking to defend the policyholder. Judicially creating a duty to defend under this excess umbrella policy may benefit certain parties in the case at issue, but it adversely affects the future costs of excess coverage and ignores fundamental principles of insurance law, which underlie our system of justice.

¶ 124. For the foregoing reasons I dissent.

¶ 125. I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and MICHAEL J. GABLEMAN join this dissent.